USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#
DATE FILED: 3/20/14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

MIRELLE VANGAS and ALFREDO VANGAS, JR.,    :

                               :

            Plaintiffs,          :

                               :

           -against-        :       **OPINION AND ORDER**

                               :       11-CV-6722 (ER)

MONTEFIORE MEDICAL CENTER, ELIZABETH,  :

BURNS, PATRICIA QUINN, and WAGEWORKS, INC.,  :

                               :

           Defendants.      :

------------------------------------------------------------------------x

Ramos, D.J.:

       Plaintiffs Mirelle Vangas ("Plaintiff" or "Mrs. Vangas") and Alfredo Vangas, Jr. ("Mr.

Vangas") (collectively, "Plaintiffs") bring this action against Defendants Montefiore Medical

Center ("MMC"), Elizabeth Burns ("Ms. Burns") and Patricia Quinn ("Ms. Quinn")

(collectively, "Defendants").[1]  Plaintiffs allege that Defendant MMC violated the Consolidated

Omnibus Budget Reconciliation Act ("COBRA") by failing to send the required COBRA

notification to Plaintiffs' correct address.  Additionally, Mrs. Vangas alleges that Defendants

failed to accommodate her disability in violation of the New York State Human Rights Law

("NYSHRL") and the New York City Human Rights Law ("NYCHRL"), as well as failed to

notify her of the cancellation of her employee benefits within five days of her termination from

MMC in violation of the New York Labor Law ("NYLL").[2]  Pending before the Court is

Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.

Doc. 54.  For the reasons set forth below, Defendants' motion for summary judgment is

---

[1] On February 21, 2013, Plaintiffs voluntarily dismissed all of their claims for relief against Defendant WageWorks, Inc.  Doc. 46.

[2] On February 22, 2013, this Court granted Defendants' motion to dismiss Plaintiffs' Family Medical Leave Act ("FMLA"), equitable estoppel, and breach of contract claims.  Doc. 48.  Accordingly, the only claims remaining are Counts Four through Eleven of the Complaint.  Doc. 1.

GRANTED in part and DENIED in part.

## I.   Statement of Facts

The following facts are undisputed except where otherwise noted.

MMC is a large, multi-campus health care provider.  Defs.' 56.1 Stmt. ¶ 1.[3]  Mrs. Vangas became an employee of MMC after her graduation from high school in 1989.  *Id.* ¶ 2.  She worked in a number of receptionist positions until she joined MMC's Care Management Organization ("CMO") as a Utilization Management Analyst ("Analyst").  Declaration of Mirelle Vangas ("Vangas Decl.") (Doc. 64) ¶ 3.  The CMO is a division of MMC that, among other things, provides patients with post-discharge care.  Defs.' 56.1 Stmt. ¶ 4.  Mrs. Vangas' initial job within the CMO was to review and authorize or deny requests for treatment.  *Id.* ¶ 6.  Thereafter, she was assigned to the "outbound team," in which capacity she made phone calls to patients who had visited the MMC emergency room or who had been discharged from a hospital to monitor and assist in their post-discharge care.  *Id.*

Defendant Quinn became Mrs. Vangas' direct supervisor at the CMO in 2008.  *Id.* ¶ 7.  Ms. Quinn reported directly to Kathleen Byrne ("Ms. Byrne"), who was employed by MMC as the Director of Medical Management.  Declaration of Richard M. Reice ("Reice Decl.") (Doc. 58), Ex. D (Byrne Dep. Tr.) at 7:21-9:23.

### a.   Mrs. Vangas' Medical Leave

Mrs. Vangas was diagnosed with anal cancer on March 25, 2010.  Vangas Decl. ¶ 7.  Immediately after receiving her diagnosis, Mrs. Vangas informed Ms. Quinn and Ms. Byrne, and took medical leave right away "without the formality of paperwork."  *Id.* ¶¶ 8-9; Defs.' 56.1 Stmt. ¶¶ 15-16.  Thereafter, Defendant Burns, who is in charge of all the Human Resources

---

[3] Citations to "Defs.' 56.1 Stmt." refer to Defendants' Statement of Material Facts Pursuant to Rule 56.1, Doc. 55.

functions in the CMO, sent FMLA leave forms to Mrs. Vangas.  Reice Decl., Ex. E (Burns Dep.

Tr.) at 13:18-20, 22:15-23:11.  Ms. Burns also notified the Human Resource Information Center

("HRIC"), MMC's centralized human resources processing center, of Mrs. Vangas' medical

leave.  Defs.' 56.1 Stmt. ¶ 19.  Mrs. Vangas completed the FMLA forms and faxed them to the

HRIC.  *Id.* ¶ 20.  Those forms indicated that Mrs. Vangas would be out on leave for a period of

three months, concluding at the end of June 2010.  Reice Decl., Ex. H.

On June 14, 2010, Mrs. Vangas saw her oncologist, who filled out a supplementary report

to update Zurich—MMC's short-term disability provider—about her medical status, and

indicated that her new return to work date would be July 19, 2010.  Vangas Decl. ¶ 21; *see also*

*id.* at Ex. B.  The receptionist at the oncologist's office faxed the paperwork directly to Zurich

for Mrs. Vangas.  Vangas Decl. ¶ 21.  Plaintiffs do not assert that the paperwork was also faxed

or otherwise delivered to MMC, nor do they submit any documentation evidencing MMC's

receipt of the supplementary report.

When Mrs. Vangas was unable to return to work at the scheduled end of her FMLA leave

in June 2010, Defendants unilaterally extended her leave.  Reice Decl., Exs. A (Vangas Dep. Tr.)

at 109:24-110:13, 112:4-17; C (Quinn Dep. Tr.) at 67:4-6.  Thereafter, on July 22, 2010, Ms.

Quinn sent Mrs. Vangas a certified letter:  (i) reminding her of her responsibility to provide

certain information to MMC in order to assist it in covering Mrs. Vangas' duties; (ii) directing

Mrs. Vangas to contact Ms. Quinn to advise her of Mrs. Vangas' anticipated return to work date;

and (iii) directing Mrs. Vangas to update Ms. Quinn on her status on a weekly basis.  Reice

Decl., Ex. J (July 22, 2010 Letter); *see also* Declaration of Orit Goldring ("Goldring Decl.")

(Doc. 65), Ex. B (Quinn Dep. Tr.) at 63:9-25.  The letter also enclosed copies of MMC's Human

Resources Policy regarding medical leave.  Goldring Decl., Ex. B at 65:15-66:5.  However, Mrs.

3

Vangas never received the letter, as the Post Office subsequently returned it to MMC as unclaimed.  *Id.* at 64:7-65:3, 69:17-22.

Mrs. Vangas states that on July 26, 2010, after realizing that some time had passed since her anticipated return-to-work date, she called Human Resources and left a message for Ms. Burns.  Vangas Decl. ¶ 24.  Jackie Colon ("Ms. Colon")—Ms. Burns' secretary—sent Ms. Burns a message stating that Mrs. Vangas had called, that "she has a medical condition and has been out since March," and that she is "very confused as to what she needs to do."  Goldring Decl., Ex. G.  Ms. Burns responded to Ms. Colon by asking her to "call [Mrs. Vangas] and let her know that there is paperwork she needs to fill out for FMLA and Disability and that we need an address to send it to.  She also has to call her manager once per week since there is no return date for her."  Goldring Decl., Ex. H.  Mrs. Vangas states that Ms. Colon left her a message and that the two played phone tag for "the next few days."  Vangas Decl. ¶ 25.  When Ms. Colon and Mrs. Vangas finally spoke on August 3, 2010, Ms. Colon told Mrs. Vangas that she was mailing her a second set of FMLA papers.  *Id.* ¶¶ 25-26.  Mrs. Vangas then informed Ms. Colon that her next appointment with the oncologist was not until August 23 and that she would have the papers filled out then, to which Ms. Colon "did not protest."  *Id.*

On August 20, 2010, Ms. Quinn sent Mrs. Vangas a text message informing her that Ms. Quinn had "just received the certified letter [she] sent [Mrs. Vangas] as unclaimed" and directing Mrs. Vangas to call Ms. Colon, as Mrs. Vangas had "not returned any of the forms that [Ms. Colon had] sent."  Defs.' 56.1 Stmt. ¶ 37.  Mrs. Vangas called Ms. Quinn after receiving her text message and asked her whether she was losing her job.  Vangas Decl. ¶ 34.  Ms. Quinn replied, "no, no, no," and explained that the letter was "just to let [Mrs. Vangas] know that [her] FMLA had been extended."  *Id.*  Mrs. Vangas contends that during this conversation, she asked Ms.

Quinn if she could work from home, as she knew that in the past, CMO employees were allowed to work from home with remote access to the databases that were needed to perform their job. *Id.* ¶ 35.  Ms. Quinn responded by saying that if it were up to her, she would be "ok with it," but that Ms. Byrne would not allow it.  *Id.* ¶ 36.  According to Ms. Quinn, however, she does not recall Mrs. Vangas making any such request to work from home.  Goldring Decl., Ex. B at 92:8-10.  Additionally, both Ms. Burns and Ms. Byrne testified that Ms. Quinn did not tell them that Mrs. Vangas had requested to work from home.  Goldring Decl., Exs. C (Burns Dep. Tr.) at 45:3-5; D (Byrne Dep. Tr.) at 104:9-12.

Mrs. Vangas contends that she then told Ms. Quinn that she had several follow-up doctors' appointments, but that she would be returning to work on August 30, 2010, to which Mrs. Quinn responded, "Ok."  Vangas Decl. ¶ 36; *see also* Defs.' 56.1 Stmt. ¶ 42.  When asked at her deposition what the basis was for her saying that she could return to work on August 30, Mrs. Vangas testified that she "[didn't] know if there was any basis."  Reice Decl., Ex. A at 133:12-15.  In her declaration in opposition to Defendants' motion for summary judgment, however, she states that during an August 3, 2010 visit with her radiation oncologist, he told her that she could return to work on August 30.  Vangas Decl. ¶ 30.  At that time, Mrs. Vangas' doctor filled out another supplementary disability report for Zurich, indicating that Mrs. Vangas' new return-to-work date was August 30, 2010.  *Id.*; *see also id.* at Ex. C.

Mrs. Vangas states that several days after her August 20 conversation with Ms. Quinn, on August 26, 2010, she called Ms. Quinn and told her that she was experiencing newly-developed symptoms, including blurred vision and facial swelling, that she was scheduled to undergo an MRI, and that she was not sure that she would be able to return to work on August 30, but that she would keep Ms. Quinn updated.  Vangas Decl. ¶ 38.  According to Mrs. Vangas, Ms. Quinn

5

"did not protest and said, ok." *Id.* Ms. Quinn testified that she recalled having a conversation with Mrs. Vangas on August 26, during which Mrs. Vangas stated that she was experiencing dizziness and other newly-developed symptoms. Goldring Decl., Ex. B at 117:12-119:17. However, she testified that she did not recall Mrs. Vangas ever stating that she would not be able to return to work on August 30. *Id.*; *see also id.* at 106:11-107:10.

Thereafter, on August 27, 2010, after an appointment with Dr. William Bodner, her radiation oncologist, Mrs. Vangas faxed another set of completed FMLA forms, which she had received earlier in August from Ms. Colon, to Christina Delavega in the MMC benefits department. Reice Decl., Ex. P; Vangas Decl. ¶¶ 25-26, 37. One of the forms was completed by Dr. Bodner, who indicated that Mrs. Vangas would be "incapacitated for a single continuous period of time due to her medical condition" and that she would need to "work part-time or on a reduced schedule" because of her medical condition; however, Dr. Bodner did not indicate the end date for such period of incapacity. Reice Decl., Ex. P; *see also* Vangas Decl. ¶ 37. Mrs. Vangas states that "[a]t this point, we did not know what was causing the blurry vision and facial swelling which is why the second set of FMLA papers says that the duration is unknown." Vangas Decl. ¶ 37.

### b. Mrs. Vangas is Terminated After she is Unable to Return to Work on August 30

On August 29, 2010, Mrs. Vangas sent Ms. Quinn the following text message:

> Good morning . . . im [sic] still not feeling well . . . having problems with my vision . . . will follow up with [D]r. Hopkins or other specialist . . . my paper work was submitted . . . thanks [M]irelle . . . .

Goldring Decl., Ex. F. According to Mrs. Vangas, after she did not receive a response to her text message, she called Ms. Quinn and left her a message stating that she would not be able to return

to work the next day; however, Ms. Quinn never returned Mrs. Vangas' phone call or text message.  Vangas Decl. ¶¶ 39-40.

The following day, on August 30, 2010, Ms. Quinn forwarded Mrs. Vangas' text message to Ms. Byrne, who then forwarded it to Ms. Burns at 4:20 pm the same day, along with an email stating:

> Mirelle did not come back as expected today.  Attached is a text she sent to [P]atti [Q]uinn.  I have completed the leave and termination form and given it to Jackie.  Chanel [Upshur] is meeting with Ruben [Vargas] tomorrow and we have completed the RFP for a replacement[.]  I also let Brett at Green Key know we are going to make an offer to Chanel pending pre-employment process and asked him to send an invoice for this to me . . .

Goldring Decl., Ex. F.

Ms. Byrne testified that after Mrs. Vangas did not return to work on August 30, she removed Mrs. Vangas from her position and filled the position with another individual; accordingly, Defendants admit that as of August 30, 2010, Mrs. Vangas was no longer employed by MMC.  Reice Decl., Ex. D at 98:18-23, 99:20-100:5; *see also* Goldring Decl., Exs. B at 128:16-129:3, 130:22-132:11; C at 66:11-67:9, 93:4-8, 98:8-11; *see also* Defs.' 56.1 Stmt. ¶ 48. In order to effectuate Mrs. Vangas' termination, Ms. Bryne filled out a "Leave and Termination Form" on August 30, stating:  "Mirelle was out on medical leave.  We held her position for over 5 months.  She is still not able to return to work and has given no date of return."  Goldring Decl., Ex. L.  The form lists August 30, 2010 as the "termination date" and indicates that Mrs. Vangas is "eligible for rehire."  *Id.*  During the time Mrs. Vangas was out on leave from March 25, 2010 until August 30, 2010, her position was filled by a temporary employee, Chanel Upshur.  Goldring Decl., Ex. D (Byrne Dep. Tr.) at 84:20-25.  Ms. Byrne testified that a temporary employee "can only take the position so far," as hospital policy does not permit them

to have access to certain hospital systems that are required to do the job, including "Carecast" (access to patient medical records) and "EPF" (access to electronic patient folders), and that by August 30, Ms. Byrne "needed someone who had full capacity who could work at full capacity." *Id.* at 84:10-90:22.  Ms. Quinn, on the other hand, testified that she was not aware of any company policy limiting temporary employees' access to certain MMC records or databases. Goldring Decl., Ex. B at 146:11-16.  Moreover, in their Responses and Objections to Plaintiffs' Request for Production of Documents, Defendants admitted that "MMC has no specific policies pertaining to temporary employees' access to company records.  All confidentiality policy and procedures apply to temporary employees assigned to MMC."  Goldring Decl., Ex. I at No. 1.

Ms. Byrne further testified that she did not receive any complaints about Ms. Upshur's performance, nor did she experience any pressure to fill the position with a permanent employee. Goldring Decl., Ex. D at 93:25-94:25.  Moreover, Ms. Byrne testified that nothing happened on August 30 that caused her decision that Ms. Upshur had to have access to all of MMC's systems in order to perform her job, and that if Ms. Upshur was not given access to Carecast and EPF on August 30, no harm would have been caused to the CMO or to the patients that Ms. Upshur was contacting.  *Id.* at 96:9-12, 97:2-4.

Mrs. Vangas claims that late in the afternoon on August 30, 2010, Mary Jo Maloney, a manager at MMC and one of Mrs. Vangas' good friends, called Mrs. Vangas and alerted her that "something was going on."  Vangas Decl. ¶ 41; *see also id.* ¶ 8.  On the morning of August 31, Mrs. Vangas called and left a message for Ms. Burns.  *Id.* ¶ 43.  After receiving no response, Mrs. Vangas called again a few hours later, at which point Ms. Colon answered the phone.  *Id.* ¶¶ 43-44.  When Mrs. Vangas identified herself, Ms. Colon asked if she was calling "regarding handing in [her] badge and key?"  *Id.* ¶ 44.  Mrs. Vangas responded in the negative, and said that

she was calling "regarding [her] papers" and asked to speak to Ms. Burns.  *Id.*  Ms. Burns then picked up and informed Mrs. Vangas that her position was being filled.  *Id.* ¶ 45; *see also* Reice Decl., Ex. E (Burns Dep. Tr.) at 91:6-93:8.[4]  According to Mrs. Vangas, Ms. Burns stated that the FMLA papers said to return to work in twelve weeks.  Vangas Decl. ¶ 45.  After Mrs. Vangas replied by stating that Defendants had extended her leave, Mrs. Burns told her that she "should have known when to come back."  *Id.*  Ms. Burns then asked Mrs. Vangas whether she was medically cleared to return to work, to which Mrs. Vangas informed her she was not.  *Id.*; *see also* Reice Decl., Ex. E at 92:9-17.  Mrs. Vangas contends that in response to Ms. Burns' inquiry as to when she expected to be medically cleared, Mrs. Vangas stated that she did not know, but that she would "do whatever [she had] to do to save [her] job."  Vangas Decl. ¶ 45.  Ms. Burns then told Mrs. Vangas that when she is medically cleared for work, she should contact Ruben Vargas, the MMC recruiter, to help her find a suitable position.  *Id.*; Reice Decl., Ex. E at 92:9-17.

According to Mrs. Vangas, during her telephone conversation with Ms. Burns, Mrs. Vangas asked Ms. Burns if the position would still be open the following day if she had her husband take her to work.  Vangas Decl. ¶ 45.  Ms. Burns responded by saying she had no knowledge of anybody else filling the position and that there was no posting for the position, as all postings go through her for approval.  *Id.*  Mrs. Vangas then asked if that meant that she could have her job back if she called Ms. Quinn, to which Ms. Burns stated, "You have to work that out with Patti [Quinn]."  *Id.*  Ms. Burns, on the other hand, testified that she and Mrs. Vangas did not discuss whether the position had been posted, and that Ms. Quinn was never referenced during the conversation.  Reice Decl., Ex. E at 94:11-18.

---

[4] Ms. Burns contends that the phone call took place on September 1, 2010.  Reice Decl., Ex. E at 91:6-11.

Ms. Burns testified that she did not submit the Leave and Termination Form terminating Mrs. Vangas' employment with MMC to Human Resources until after she spoke to Mrs. Vangas on the phone on either August 31 or September 1.  *Id.* at 99:7-100:23.  However, Ms. Burns admits that Mrs. Vangas "was no longer employed by Montefiore on August 30th," *id.* at 98:8-11, and that Ms. Byrne filled out the Leave and Termination Form on August 30 and listed August 30, 2010 as the effective date.  *Id.* at 99:25-100:4; *see also* Goldring Decl., Ex. L.  Ms. Burns testified that she specifically held on to the paperwork because she was waiting "to see what happens" and "for [Mrs. Vangas] to call [her]."  Goldring Decl., Ex. C at 138:5-139:22..

Mrs. Vangas contends that after her conversation with Ms. Burns, she called Ms. Quinn to ask her if the position had been posted.  Vangas Decl. ¶ 46.  Ms. Quinn said she had to speak with Ms. Byrne and that she would call Mrs. Vangas back; however, according to Mrs. Vangas, Ms. Quinn never called her back.  *Id.* ¶¶ 46-47.  Moreover, Mrs. Vangas contends that she called Ms. Quinn three more times that day and that Ms. Quinn finally picked up on the third try after Mrs. Vangas had blocked her phone number.  *Id.* ¶ 47.  When Mrs. Vangas asked whether Ms. Quinn was able to speak to Ms. Byrne about the posting, Ms. Quinn stated, "I can't talk to you anymore, you have to deal with human resources."  *Id.*  Ms. Quinn, on the other hand, stated that she did not recall speaking to Mrs. Vangas on August 31, 2010 or at *any* time after Mrs. Vangas did not return to work on August 30.  Goldring Decl., Ex. B at 139:18-141:16.

### c.  Mrs. Vangas' Post-Termination Employment

On or about September 13, 2010, Mrs. Vangas interviewed for a position at MMC's Emerging Health Information Technology ("EHIT") affiliate, which was arranged by a friend of Mrs. Vangas' who worked at MMC.  Vangas Decl. ¶¶ 49, 51; *see also* Reice Dec., Ex. A at 166:21-167:4.  Mrs. Vangas was not offered the EHIT position.  Vangas Decl. ¶ 52.  Moreover,

10

Mrs. Vangas admits that as of the date of the interview for the EHIT position, she had not been cleared to return to work by her doctor.  Reice Decl., Ex. A at 167:5-17.  After the September 13, 2010 EHIT interview, Mrs. Vangas did not apply for any other positions at MMC.  *Id.* at 170:23-171:3.  Mrs. Vangas contends that as of October 2010, she was fully capable of performing the work that was required in her former position at MMC, which allowed her to sit in a chair all day as she made phone calls.  Vangas Decl. ¶ 55.

### d.  Mrs. Vangas' Health Benefits

MMC terminated Mrs. Vangas' health benefits on September 24, 2010, effective August 31, 2010.  Goldring Decl., Ex. M; Reice Decl., Ex. R (Montalto Dep. Tr.) at 31:4-8.  Mrs. Vangas claims that in October 2010, she received a letter from MMC, dated September 23, 2010, informing her that her health benefits "will continue through the end of the month of [her] last official day as a Montefiore associate."  Vangas Decl. ¶ 57; *id* at Ex. D.  The letter also indicated that WageWorks, MMC's COBRA administrator, would be sending Mrs. Vangas a COBRA Enrollment Kit.  *Id.*

WageWorks was notified of Mrs. Vangas' termination—a COBRA-qualifying event—by MMC, and sent a notice to Mrs. Vangas via first class mail on September 28, 2010.  Reice Decl., Ex. U (Bentley Dep. Tr.) at 13:10-24, 54:4-55:3.  However, Plaintiffs contend that they never received the COBRA notice, Vangas Decl. ¶ 61, as the notice was addressed to "Cornwallonhuds, NY" instead of "Cornwall on Hudson," the town in which Plaintiffs live.  Goldring Decl., Ex. K.  MMC contends, however, that the "address is laid out in a way that would ensure the delivery of [the] letter," and that "[p]er the post office, the abbreviation of Cornwall on Hudson is perfectly acceptable."  Defs.' 56.1 Stmt. ¶ 65.  In support of its contention that the abbreviation is "perfectly acceptable," Defendant cites to a printout from the

U.S. Postal Service's website, which lists "preferred or acceptable city names" for Cornwall on Hudson.  Reice Decl., Ex. Y.  The "preferred city" is listed as "Cornwall on Hudson," and the other "acceptable cit[y]" is "Cornwall Hdsn."  *Id.*  Accordingly, in response, Plaintiffs argue that "[p]er the post office, the abbreviation 'CornwallonHuds' is not 'perfectly acceptable.'"  Pls.' Response to Defs.' 56.1 Stmt. ¶ 65.

WageWorks mailed a second notice to Mrs. Vangas, dated November 25, 2010, regarding "[n]on-commencement of COBRA coverage through Montefiore Medical Center."  Reice Decl., Ex. W.  That notice stated that Mrs. Vangas' "participation in . . . COBRA cannot commence because . . . [n]o enrollment form was received during the enrollment period."  *Id.*  Like the first COBRA notice, the November 25 notice was addressed to "Cornwallonhuds," rather than "Cornwall on Hudson," and, accordingly, Plaintiffs never received it.  *Id.*; Vangas Decl. ¶ 61.

It is undisputed that Mrs. Vangas has only paid between $75 and $100 out of her own pocket for medical expenses she incurred as a result of not having COBRA coverage.  Reice Decl., Ex. A at 220:12-25.  However, Mrs. Vangas contends that she and her husband have incurred "thousands of dollars in medical bills from September 2010 and have not had the money to pay the bills," and have been receiving calls from collection agencies regarding the outstanding bills for the past three years.  Vangas Decl. ¶ 58.

## II.    Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might

12

affect the outcome of the litigation under the governing law.  *Id.*  The party moving for summary

judgment is first responsible for demonstrating the absence of any genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the

nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue

of fact for trial in order to avoid summary judgment."  *Saenger v. Montefiore Med. Ctr.*, 706 F.

Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (quoting *Jaramillo v.

Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

 In deciding a motion for summary judgment, the Court must "'construe the facts in the

light most favorable to the non-moving party and must resolve all ambiguities and draw all

reasonable inferences against the movant.'"  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir.

2011) (quoting *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir. 2004)).  However,

in opposing a motion for summary judgment, the non-moving party may not rely on unsupported

assertions, conjecture or surmise.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14,

18 (2d Cir. 1995).  The non-moving party must do more than show that there is "some

metaphysical doubt as to the material facts."  *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.

2006) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio

Corp.,* 475 U.S. 574, 586 (1986)).  To defeat a motion for summary judgment, "the non-moving

party must set forth significant, probative evidence on which a reasonable fact-finder could

decide in its favor."  *Senno*, 812 F. Supp. 2d at 467-68 (citing *Anderson v. Liberty Lobby*, 477

U.S. 242, 256–57 (1986)).

### III. MMC is Not Entitled to Summary Judgment on Plaintiffs' COBRA Claim

 Defendant MMC seeks summary judgment on Plaintiffs' COBRA claim.  Specifically,

Plaintiffs contend that MMC failed to provide them with notice of their COBRA rights, in

violation of 29 U.S.C. § 1166(a)(4)(A), because the notice was incorrectly addressed to "CornwallonHuds" instead of "Cornwall on Hudson" and, consequently, was never received by Plaintiffs.

The purpose of COBRA is to allow employees who lose their jobs to continue their medical coverage at approximately the group rate, which is lower than the rate for individual coverage. *See Local 217, Hotel & Rest. Emps. Union v. MHM, Inc.*, 976 F.2d 805, 809 (2d Cir. 1992). The notification requirements of COBRA are clear. In the event of a covered employee's termination, an employer must notify the administrator of the group health care plan within thirty days, 29 U.S.C. § 1166(a)(2); the administrator then has fourteen days to notify the qualified beneficiary of her right to continue coverage, *id.* § 1166(a)(4).

MMC contends that its actions did not violate COBRA because it made a "good faith" effort to notify the plan beneficiary. In setting forth that argument, MMC relies on case law stating that "COBRA does not require actual receipt of notification by the plan participant; to the contrary, only a good faith attempt to notify is required." *Ramos v. SEIU Local 74 Welfare Fund*, No. 01 Civ. 2700 (SAS), 2002 WL 519731, at *5 (S.D.N.Y. Apr. 5, 2002) (citations omitted). This "good faith" standard obligates employers to use means "reasonably calculated" to reach plan participants. *See Phillips v. Saratoga Harness Racing, Inc.*, 233 F. Supp. 2d 361, 365 (N.D.N.Y. 2002) (citations omitted). Moreover, an employer or plan administrator who "sends proper notice to the covered employee's last know[n] address is deemed to be in good faith compliance with COBRA's notification requirements." *Chesney v. Valley Stream Union Free Sch. Dist. No. 24*, No. 05 Civ. 5106 (DRH) (ETB), 2009 WL 936602, at *4 (E.D.N.Y. Mar. 31, 2009) (internal quotation marks and citation omitted). MMC contends that it fully complied with its obligations under COBRA by providing the Vangas family's last known address to

14

WageWorks, who, in turn, timely mailed the COBRA notice to Mrs. Vangas.  Defs.' Mem. L. (Doc. 59) 24.  It contends that its abbreviation of "Cornwall on Hudson" does not indicate bad faith and, to the contrary, that "CornwallonHuds" is a perfectly acceptable abbreviation of the town name according to the U.S. Postal Service.  *Id.* at 24-25.

Although MMC correctly notes that an employer's mailing of the required notification to an employee's "last known address" is deemed to be good faith compliance with COBRA, it fails to directly address the undisputed fact that the address it provided to WageWorks abbreviated the name of the town in which Plaintiffs reside.  Indeed, in holding that defendants complied with COBRA's notification requirement, the court in *Chesney* specifically noted that there was "no claim by Plaintiff that the address was incorrect."  *Chesney*, 2009 WL 936602, at *4.  And, as the Second Circuit has repeatedly held, only a "*properly addressed*" piece of mail "placed in the care of the Postal Service is presumed to have been delivered."  *Hoffenberg v. C.I.R.*, 905 F.2d 665, 666 (2d Cir. 1990) (emphasis added).  Here, Plaintiffs do, in fact, contend that the address was incorrect in that MMC improperly abbreviated "Cornwall on Hudson."  Accordingly, to the extent the notice was not "properly addressed," the presumption of receipt does not apply.  *See Burton v. Banta Global Turnkey Ltd.*, 170 F. App'x 918, 924 (5th Cir. 2006) (holding that the presumption of receipt did not apply to COBRA notification where plaintiff's address was "6514 Sandy Oak" and the letter was addressed to "6514 Sandy York").

Moreover, MMC does not suggest that the address provided to it by Mrs. Vangas included the abbreviation "CornwallonHuds" or, for that matter, *any* abbreviation for "Cornwall on Hudson," thereby defeating Plaintiffs' claim.  *Cf. Robinson-Reeder v. Am. Council on Educ.*, 674 F. Supp. 2d 49, 57 (D.D.C. 2009) (rejecting plaintiff's argument that defendant violated COBRA's notification requirement by omitting plaintiff's apartment number in the address

15

provided to its plan administrator where the address plaintiff provided to defendant also omitted the apartment number; thus, "[a]lthough the address may have been incomplete, [plaintiff] is not entitled to 'benefit from her own error'") (citation omitted).  Finally, although Defendant argues that the abbreviation it used for Cornwall on Hudson "is perfectly acceptable to the Post Office," Defs.' Mem. L. 25, the evidence to which it cites—a printout from the website for the U.S. Postal Service—in no way supports MMC's assertion.  To the contrary, the printout lists only one acceptable abbreviation for Cornwall on Hudson, and it is *not* "CornwallonHuds."  Reice Decl., Ex. Y.  Accordingly, as the record demonstrates that the address MMC provided to WageWorks included an incorrect abbreviation, and there is no evidence indicating that the abbreviation used by MMC was provided to it by Mrs. Vangas, material issues of fact exist as to Plaintiffs' COBRA claim and, accordingly, MMC's motion for summary judgment on that claim is DENIED.

## IV.   Mrs. Vangas' Failure to Accommodate Claims

Mrs. Vangas claims that Defendants violated the NYSHRL and NYCHRL by failing to accommodate her disability.  The NYSHRL and the NYCHRL make it unlawful, among other things, for any employer to fail to provide reasonable accommodations for known disabilities of their employees.  NYSHRL § 296(3)(a); NYCHRL § 8-107(15)(a).  This rule is subject to the exception that employers are not required to provide accommodations that would subject the employer to undue hardship.  NYSHRL § 296(3)(b); NYCHRL § 8-102(18).  In order to make out a prima facie case of failure to accommodate, the plaintiff must show that:  (1) she was disabled as defined by the statutes; (2) her employers had notice of the disability; (3) with reasonable accommodation, she could perform the essential functions of her job, and (4) the defendants refused to make reasonable accommodations for her needs.  *See Parker v. Columbia*

*Pictures Indus.*, 204 F.3d 326, 332, 332 n.1 (2d Cir. 2000).

Here, Defendants admit that Mrs. Vangas was disabled and that Defendants had notice of that disability.  Defs.' Mem. L. 16.  Accordingly, the only remaining factors are whether:  (i) with a reasonable accommodation, she could perform the essential functions of her job; and (ii) Defendants refused to make such accommodation.  Defendants contend that Mrs. Vangas could not perform the job when absent from work and that Defendants did not refuse to make reasonable accommodations for her disability.  *Id.*  Mrs. Vangas, on the other hand, argues that Defendants wrongfully refused her requests for reasonable accommodations, which included her requests for additional leave time, as well as her request to work from home.  Pls.' Mem. L. Opp. (Doc. 61) 6-11.  Plaintiff also contends that Defendants violated the NYSHRL and NYCHRL by refusing to engage in the required "interactive process" in response to her requests for accommodations for her disability.  *Id.* at 10-15.

### a.  Plaintiff's Communications with Defendants

#### i.  Under the NYSHRL

As stated above, Plaintiff claims that on August 26, 2010, she called Ms. Quinn and told her of her newly-developed symptoms.  She also informed Ms. Quinn that she was not sure that she would be able to return to work on August 30, and that she would keep Ms. Quinn updated. Vangas Decl. ¶ 38.  Thereafter, on August 29, Mrs. Vangas sent Ms. Quinn the following text message:

> Good morning . . . im [sic] still not feeling well . . . having problems with my vision . . . will follow up with [D]r. Hopkins or other specialist . . . my paper work was submitted . . . thanks [M]irelle . . . .

Goldring Decl., Ex. F.  The parties dispute whether Mrs. Vangas' August 26 and 29

communications with Ms. Quinn constituted requests for additional leave time and, if so, whether such requests were "reasonable" under the applicable law.

Defendants argue that even crediting Mrs. Vangas' testimony regarding her communications with Ms. Quinn, those communications "indicated that her leave was open-ended" and, accordingly, MMC was not obligated to "accommodate" her request for indefinite leave.  Defs.' Mem. L. 17.  As Defendants correctly argue, "[t]he duty to make reasonable accommodations does not . . . require an employer to hold an injured employee's position open indefinitely while the employee attempts to recover."  *Parker*, 204 F.3d at 338.

Mrs. Vangas, on the other hand, argues that her August 26 and 29 communications with Ms. Quinn did *not* constitute requests for indefinite leave but, rather, were reasonable requests for more time to follow up with doctors regarding her newly-developed symptoms.  Plaintiff argues that viewing the record in the light most favorable to her, a reasonable jury could conclude that these communications were requests for additional leave time, rather than requests for an indeterminate leave of absence.  Pls.' Mem. L. Opp. 6-7.  In support of her argument, Plaintiff relies on *Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181 (2d Cir. 2006) ("*Graves I*"), in which the Second Circuit held that a leave of absence may qualify as a "reasonable accommodation" assuming it is of finite duration and is reasonably likely to enable the employee to return to work.  *Id.* at 185 n.5.  In making a request for additional leave time, the plaintiff in *Graves* informed his employer that he needed additional time to secure an appointment with a specialist and that he believed it would take "a couple weeks" in order to do so.  *Id.* at 184-85. Viewing the record in the light most favorable to the plaintiff, the Second Circuit held that "it was imprecise to call the requested leave of absence 'indefinite'" and that a "factfinder could find, based on [plaintiff's] testimony that he asked for 'more time' to get a doctor's appointment

and that it would take a 'couple of weeks,'" that granting the requested leave "would not require [defendant] to hold open [plaintiff's] position indefinitely." *Id.* at 185-86.  Similarly, here, Plaintiff contends that a reasonable jury could interpret Mrs. Vangas' communications as requests for a limited extension of time in order to follow up with doctors concerning her newly-developed symptoms.

The Court finds that even viewing the evidence in the light most favorable to Plaintiff, no reasonable jury could find that Plaintiff's communications with Defendants constituted requests for a finite amount of extended leave time; rather, Plaintiff merely communicated to Defendants that she was not able to return to work on her scheduled return date, and did not indicate how long of an extension of leave she would require.  Accordingly, her communications may only fairly be characterized as requests for indefinite leave.[5]  As stated above, case law is clear that under the NYSHRL, an employer is not required to hold an employee's position open indefinitely and, accordingly, Defendants cannot be held liable for their refusal to accommodate Mrs. Vangas' request for an indeterminate extension of her medical leave.  *See Parker*, 204 F.3d at 332 n.1, 338; *see also Romanello v. Intesa Sanpaolo, S.p.A.*, 22 N.Y.3d 881, 884 (N.Y. 2013) ("Indefinite leave is not considered a reasonable accommodation under the State HRL.").

Moreover, the Court finds that Plaintiff's reliance on *Graves I* is misplaced, as there, the plaintiff actually gave his employer an indication of how much additional leave time he would

---

[5] Although Plaintiff contends in her opposition papers that "[p]roviding a *few more weeks* of leave would not have been an undue hardship for MMC," Pls.' Mem. L. Opp. 18 (emphasis added), she provides *no* evidentiary support for her assertion that any additional leave would only be for "a few more weeks" or that she ever indicated to Defendants that she was requesting only an additional "few weeks."   Rather, the record clearly demonstrates that during her late August conversations with Ms. Quinn, Plaintiff did not indicate when she expected to return to work; to the contrary, all she conveyed to Ms. Quinn was that she was not able to return to work on August 30.  Moreover, as the Court finds that Plaintiff's communications with Defendants constituted requests for indefinite leave, it finds that such requests were unreasonable *as a matter of law*.  Accordingly, it need not address Plaintiff's argument that granting Plaintiff her requested leave would not have been an undue burden for MMC.  *See* Pls.' Mem. L. Opp. 17-19.

require to follow up with a specialist.[6]  *Graves I*, 457 F.3d at 185-86.  Here, on the other hand,

Plaintiff did not give Defendants any indication of when she expected to return to work at the

time she informed them that she was not well enough to resume her regular duties on August 30.

Rather, according to Plaintiff, she merely informed Ms. Quinn on both August 26 and August 29

that she was "still not feeling well" and was not sure that she would be able to return to work on

August 30, as planned.  Vangas Decl. ¶ 38; Goldring Decl., Ex. F.  Although a reasonable

allowance of time for medical leave may, in appropriate circumstances, constitute a reasonable

accommodation, where, as here, Plaintiff has failed to present any evidence of the expected

duration of her impairment or the date on which she would likely be able to resume her regular

duties at MMC, no reasonable jury could find that the accommodation requested was

reasonable.[7]  Indeed, those cases that have analyzed requests similar to those made by Mrs.

Vangas here have uniformly held that they constituted requests for *indefinite leave*.  *See, e.g.*,

*Nandori v. City of Bridgeport*, No. 12 Civ. 673 (JBA), 2014 WL 186430, at *5-*7 (D. Conn. Jan.

16, 2014) (characterizing plaintiff's request as one for indefinite leave where plaintiff did not

communicate to defendant what his estimated return date might be and requested additional

leave to "receive treatment and recover, but provided no description of that treatment, nor an

estimate of how long might be needed"); *Forgione v. City of New York*, No. 11 Civ. 5248 (JG),

---

[6] The Court notes that on remand, the district court in *Graves* granted summary judgment for defendant upon a finding that the two weeks unpaid leave sought by plaintiff was not a reasonable accommodation because, *inter alia*, the plaintiff had made no showing that the accommodation would likely result in his successful return to work. *Graves v. Finch Pruyn & Co., Inc.*, No. 03 Civ. 266 (GLS) (RFT), 2009 WL 819380, at *1 (N.D.N.Y. Mar. 27, 2009).  The Second Circuit affirmed the district court's decision on appeal, holding that plaintiff failed to demonstrate that at the time of his request, the defendant "had any assurance whatsoever that the accommodation would allow [plaintiff] to perform the essential functions of his job."  *Graves v. Finch Pruyn & Co., Inc.*, 353 F. App'x 558, 561 (2d Cir. 2009) ("*Graves II*").

[7] Plaintiff notes that "Ms. Quinn admitted that the August 29 text was a request for more leave time."  Pls.' Mem. L. Opp. 11 (citing Goldring Decl., Ex. B at 133:14-134:6).  However, Ms. Quinn's admission that Mrs. Vangas' text message constituted a request for more leave time does not compel a different outcome, as Ms. Quinn does not suggest or admit that she understood the request was for a finite period or was otherwise *reasonable*.

2012 WL 4049832, at *9 (E.D.N.Y. Sept. 13, 2012) (construing plaintiff's request as a request for indefinite leave where he "simply asked for 'some time off so he could address his medical condition,'" and holding that "[b]ereft of any allegations that [plaintiff] informed the defendants of how much leave he would need, what he would do during his leave, [or] whether and how the leave would allow him to perform the essential functions of his job," plaintiff failed to state a reasonable accommodation claim); *McNamara v. Tourneau, Inc.*, 496 F. Supp. 2d 366, 377 (S.D.N.Y. 2007) (holding that plaintiff's request was one for indefinite leave where "he wanted to be able to stay out of work until he decided he was able to return" but "did not provide [defendant] with any idea of when he expected to return," and holding that "it was not reasonable for [plaintiff] to expect [defendant] to hold his job open indefinitely, particularly as he had already been out of work some six weeks"), *aff'd*, 326 F. App'x 68 (2d Cir. 2009); *Stamey v. NVP Holdings, Inc.*, 358 F. Supp. 2d 317, 325-27 (S.D.N.Y. 2005) (holding that plaintiff's request was for an indefinite leave of absence where he was unable to provide defendant with an anticipated return date); *see also Hudson v. MCI Telecomms. Corp.*, 87 F.3d 1167, 1169 (10th Cir. 1996) (holding that no reasonable jury could find that the accommodation plaintiff requested was reasonable where she "failed to present any evidence of the expected duration of her impairment" and where her physicians' reports "indicate only that permanent impairment was not anticipated" and do not provide any indication "of when plaintiff could expect to resume her regular duties").

To the extent that Plaintiff contends her August 31 conversation with Ms. Burns also constituted a reasonable request for additional leave, that argument is rejected. Although Plaintiff contends that during her August 31 conversation with Ms. Burns, Mrs. Vangas informed her that she would "do whatever [she had] to do to save [her] job" and inquired as to whether her

job would be available if she came into work the following day, Mrs. Vangas testified that at the time of that conversation, she was still ill, and did not know when she would actually be able to return to work. Goldring Decl., Ex. A at 136:3-16, 154:11-21. Accordingly, Mrs. Vangas' inquiry about returning to work the following day cannot be read as a request for a reasonable accommodation, as the record is clear that, notwithstanding her inquiry, Mrs. Vangas was not physically able to return to work on September 1.[8]

In *Graves II*, the Second Circuit held that to be considered "reasonable," a leave of absence "must enable the employee to perform the essential functions of his job" upon his return. *Graves II*, 353 F. App'x at 560. Here, as of the time of Plaintiff's conversations with both Ms. Quinn and Ms. Burns, she had already been granted two requests for medical leave, and had given Defendants no assurance whatsoever that a further extension of leave would allow her to perform the essential functions of her job. Indeed, as Defendants note, on September 10, 2010— shortly after Mrs. Vangas' communications with Defendants regarding her inability to return to work on August 30—her doctor indicated in a supplemental form to her insurance company that Mrs. Vangas would not be able to return to work for another 1-3 months. Reice Decl., Ex. N.

As the record clearly indicates that Plaintiff failed to provide Defendants with any

---

[8] Plaintiff contends that Ms. Burns' focus on whether Mrs. Vangas was "medically cleared to return to work" was a *per se* violation of the disability law. *See* Pls.' Mem. L. Opp. 15-16. In making such an argument, Plaintiff relies on case law stating that "policies prohibiting injured employees from returning to work unless they can do so 'without restrictions' violate the ADA." *E.E.O.C. v. Yellow Freight Sys., Inc.*, No. 98 Civ. 2270 (THK), 2002 WL 31011859, at *20 (S.D.N.Y. Sept. 9, 2002). However, Ms. Burns' inquiry does not suggest that MMC had a "100% healed policy" and that Mrs. Vangas would not be permitted to return to work unless she was completely healed. Rather, Ms. Burns' inquiry refers to MMC's requirement that employees returning to work from an absence of five or more days "because of illness . . . report to the [Occupational Safety and Health Department] to obtain a 'Return to Work' slip," in order to "insure that an employee poses no danger to themselves, their co-workers or to [MMC's] patients." Affidavit of Yvonne Morales ("Morales Aff.") (Doc. 67) ¶ 5. Moreover, even assuming MMC *did* have a "100% healed policy," it is undisputed that prior to Ms. Burns' inquiry into Mrs. Vangas' medical clearance, Mrs. Vangas had already informed Defendants that she was too ill to return to work on August 30. Accordingly, that Mrs. Vangas did not return to work on August 30—or anytime thereafter—was not because of MMC's alleged "100% healed policy," but rather because she had determined that she was unable to return to work and failed to give MMC any indication of when she expected to be able to do so.

indication of when she would be able to return to work, it was unreasonable for her to expect

Defendants to hold her job open indefinitely, particularly in light of the fact that she had already

been out of work for approximately five months as of August 30.  Accordingly, as requests for

indefinite leave are *per se* unreasonable under the NYSHRL, Plaintiff cannot succeed on her

failure to accommodate claim under that statute.

### ii.  Under the NYCHRL

Plaintiff argues that even assuming this Court finds that her communications with

Defendants constituted requests for indefinite leave, because the NYCHRL provides broader

protections than its state counterpart, Defendants are not entitled to summary judgment on

Plaintiff's NYCHRL claim.  Pls.' Mem. L. Opp. 7-9.  The NYCHRL provides broader protection

than the Americans with Disabilities Act ("ADA") and the NYSHRL, as it defines a "reasonable

accommodation" to be "such accommodation that *can* be made that shall not cause undue

hardship in the conduct of the [employer's] business.  The [employer] shall have the burden of

proving undue hardship."  NYCHRL § 8-102(18) (emphasis added).  In other words, under the

NYCHRL, "there are no accommodations that may be 'unreasonable' if they do not cause undue

hardship."  *Phillips v. City of New York*, 884 N.Y.S.2d 369, 378 (1st Dep't 2009), *cited with*

*approval*, *Romanello*, 22 N.Y.3d  at 884.  And "there is no accommodation (whether it be

indefinite leave time or any other need created by a disability) that is categorically excluded from

the universe of reasonable accommodation."  *Id.*  Thus, under the NYCHRL, a request for

indefinite leave is not unreasonable as a matter of law and, rather, in order to avoid liability for

failure to accommodate the request, the burden falls on Defendants to demonstrate that granting

Plaintiff indefinite leave would cause an undue hardship.  *Id.*

In support of their motion for summary judgment on Plaintiff's NYCHRL claim,

23

Defendants argue both that Mrs. Vangas never actually requested additional leave time—for a finite *or* indefinite period of time—and that granting Mrs. Vangas indefinite leave would cause an undue hardship on MMC.[9]  Defs.' Reply Mem. L. 2-7.  With respect to Defendants' first argument, although they correctly argue that as a general rule, the burden to request an accommodation is on the disabled employee, *id.* at 3, an exception exists where, as here, "the disability is obvious—which is to say, if the employer knew or reasonably should have known that the employee was disabled."  *Petrone v. Hampton Bays Union Free Sch. Dist.*, No. 03 Civ. 4359 (SLT) (ARL), 2013 WL 3491057, at *28 (E.D.N.Y. July 10, 2013) (quoting *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008)).  Here, Defendants were clearly on notice of Mrs. Vangas' disability, as she had been out on leave since her diagnosis in March 2010. *Bresloff-Hernandez v. Horn*, No. 05 Civ. 0384 (JGK), 2007 WL 2789500 (S.D.N.Y. Sept. 25, 2007), a case upon which Defendants rely, is therefore inapposite, as there, the employer was not aware of the employee's disability and therefore could not be held liable for failing to make a reasonable accommodation.  *Id.* at *9-*10 (noting that an "employer is obligated to accommodate only those disabilities that are obvious or called to its attention by the employee") (citation omitted).  Accordingly, to the extent Defendants argue that Mrs. Vangas' claim fails because Defendants were not *aware* of her need for an accommodation, that argument is belied

---

[9] Defendants also argue for the first time in their Reply Memorandum that the NYCHRL is inapplicable to this dispute "because none of the operative facts of this case, the alleged harm or the 'impact' of defendants' alleged conduct took place within the City of New York."  Defs.' Reply Mem. L. 1.  It is well-established that a party cannot assert an argument for the first time in a reply brief; thus, the Court has not considered the merits of this assertion. *See, e.g.*, *Evangelista v. Ashcroft*, 359 F.3d 145, 155 n.4 (2d Cir. 2004) ("'[W]e will not consider an argument raised for the first time in a reply brief.'") (quoting *United States v. Yousef*, 327 F.3d 56, 115 (2d Cir. 2003)).  Even assuming the Court exercised its discretion to consider Defendants' argument, *see Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005), the Court finds that issues of fact preclude a finding of summary judgment as to the applicability of the NYCHRL.  Defendants rely on the Affidavit of Patricia Quinn in support of their assertion that it is "undisputed" that the CMO is located in Westchester County and that "[a]ll of the decisions made with regards to [Mrs. Vangas' employment] . . . including the decision to fill her position, were made in this building [in Westchester County]."  Quinn Aff. ¶ 8.  However, as Defendants first raised the issue in their Reply brief, Plaintiff has not had the opportunity to contest the asserted facts upon which Defendants rely.  Accordingly, the Court declines to characterize any of Defendants' asserted facts as "undisputed."

by the clear record in this case.

Next, Defendants argue that even assuming Mrs. Vangas' communications were requests for indefinite leave—and were therefore not unreasonable as a matter of law under the NYCHRL—summary judgment should nevertheless be granted in Defendants' favor, as granting Mrs. Vangas indefinite leave would impose an undue burden.[10]  Defs.' Reply Mem. L. 5-7.  The Court finds that material issues of fact exist as to the issue of whether granting Mrs. Vangas an extension of her leave for an indeterminate period of time would cause MMC to suffer an undue hardship.  As stated above, the burden of proving that the requested accommodation would result in an undue hardship is on Defendants.  NYCHRL § 8-102(18).  The NYCHRL defines "undue hardship" as "an accommodation requiring significant expense or difficulty."  *Id.* § 8-107(3)(b).  In determining whether an accommodation constitutes an undue hardship, factors a court may consider include:  (a) the nature and cost of the accommodation; (b) "the overall financial resources of the facility . . . involved in the provision of the reasonable accommodation; . . . the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility"; (c) the overall financial resources of the employer; and (d) "the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity . . . ."  *Id.* § 8-102(18).  The question of whether an accommodation would cause an employer undue hardship is "singularly case-specific."  *Phillips*, 66 A.D.3d at 180.

Here, Defendants argue that continuing to retain a temporary employee to fill in for Mrs. Vangas would create an undue burden because temporary employees are not allowed full access

---

[10] Defendants also argue that indefinite leave is unreasonable as a matter of law under the NYCHRL.  Defs.' Reply Mem. L. 4.  In making such an argument, however, Defendants ignore the clear New York state case law holding that indefinite leave is *not* "categorically excluded from the universe of reasonable accommodation" under the NYCHRL.  *Phillips*, 884 N.Y.S.2d at 378.

to certain computer systems necessary to the job.  Defs.' Mem. L. 18.  However, the Court finds

that material issues of fact exist as to MMC's policy with respect to temporary employees, as

well as the hardship that an extension of Mrs. Vangas' leave would cause MMC to suffer.  First,

the Court notes that, contrary to Defendants' contention, it is *not* undisputed that hospital policy

precludes temporary employees from gaining access to certain programs.  Indeed, although Ms.

Byrne testified that such a policy exists, Goldring Decl., Ex. D at 90:18-22, Ms. Quinn testified

that she was not aware of any such policy, Goldring Decl., Ex. B at 146:11-16.  Moreover, in

their Responses and Objections to Plaintiffs' Request for Production of Documents, Defendants

admitted that "MMC has no specific policies pertaining to temporary employees' access to

company records."  Goldring Decl., Ex. I at No. 1.  The Court's determination that the issue of

undue hardship cannot be determined as a matter of law is further bolstered by the fact that

Defendants admitted that no harm would have been caused to the CMO or to the patients that

Ms. Upshur was working with if she was not granted access to certain MMC systems on August

30, 2010.  Goldring Decl., Ex. D at 96:9-12, 97:2-4.

Accordingly, as a reasonable jury could interpret Mrs. Vangas' communications as

requests for indefinite leave—which are not *per se* unreasonable under the NYCHRL—and as

issues of fact exist as to whether granting such a request would cause MMC to suffer an undue

hardship, Defendants are not entitled to summary judgment on Plaintiff's NYCHRL claim.

### b.  Plaintiff's Request to Work from Home

Defendants contend that their denial of Mrs. Vangas' request to work from home does

not constitute a failure to provide a reasonable accommodation because "it was not technically

possible" and courts have recognized that "[w]orking at home is an extraordinary

accommodation warranted only in exceptional cases."  Defs.' Mem. L. 19 n.17 (quoting *Keller v.*

26

*McGraw-Hill Cos., Inc.*, No. 99 Civ. 3110 (TPG), 2002 WL 31016647 (S.D.N.Y. Sept. 10,

2002), *aff'd*, 96 F. App'x 56 (2d Cir. 2004)).  They contend that at the time of Plaintiff's inquiry,

MMC did not have procedures or protocols in place to allow CMO Analysts, the position Mrs.

Vangas held, to work remotely and that, "[o]nly today is MMC implementing such a program."

Defs.' Reply Mem. L. 8 (citing Affidavit of Patricia Quinn ("Quinn Aff.") (Doc. 66) ¶ 7).

Finally, Defendants argue that Mrs. Vangas was not well enough to work from home anyway, as

she had developed blurry vision and other new symptoms around the time she requested to work

remotely.  *Id.*  Plaintiff, on the other hand, argues that Defendants failed to engage in an

interactive process regarding her request to work from home, discussed *infra*, and that issues of

fact exist as to whether Mrs. Vangas would be able to perform the "essential functions" of her

job from home, as well as whether permitting Mrs. Vangas to work from home would cause

MMC to suffer an undue burden.  Pls.' Mem. L. Opp. 10-11, 22.

  The Court finds that issues of fact exist regarding the reasonableness of Plaintiff's request

to work from home and, accordingly, the Court cannot find that Plaintiff's request was

unreasonable as a matter of law.  Although Defendants accurately cite case law suggesting that

permitting an employee to work from home is an "extraordinary" accommodation, here, the

record is unclear as to whether other MMC employees—including ones in Mrs. Vangas' own

department—were permitted to work from home via remote access.[11]  *See* Vangas Decl. ¶ 35.

Moreover, the Court notes that notwithstanding the case law relied upon by Defendants, the

Second Circuit has "implied . . . that permitting unsupervised work [including work from home]

might, in some cases, constitute a reasonable accommodation."  *McMillan v. City of New York*,

711 F.3d 120, 128 n.4 (2d Cir. 2013) (citing *Nixon-Tinkelman v. N.Y.C. Dep't of Health &*

---

[11] Moreover, as differing testimony exists as to whether Mrs. Vangas did, in fact, request to work from home, a
question of fact as to that issue remains as well.

*Mental Hygiene*, 434 F. App'x 17, 20 (2d Cir. 2011) (summary order) (remanding to the district court to consider, *inter alia*, whether it would have been reasonable for defendants to have allowed plaintiffs to work from home); *DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 104 (2d Cir. 2010) (suggesting that employer had provided a reasonable accommodation by allowing employee to work from home)).

While Mrs. Vangas testified that she knew of other employees who were permitted to work from home on a temporary basis—three of whom Mrs. Vangas identified by name—Goldring Decl., Ex. A at 155:16-156:8; Vangas Decl. ¶ 35, Defendants submitted an affidavit by Ms. Quinn stating that MMC did not have the procedures in place to allow CMO Analysts to work from home at the time of Mrs. Vangas' request, Quinn Aff. ¶ 7. However, Mrs. Vangas contends that Ms. Quinn responded to her request to work from home by indicating that "she would be ok with it." Vangas Decl. ¶ 36. A jury could therefore reasonably imply that if Ms. Quinn—Mrs. Vangas' direct supervisor—would be "ok" with Mrs. Vangas working from home, the necessary procedures were, in fact, in place to permit Mrs. Vangas to do so. It is well-settled that a district court may not make credibility determinations on a motion for summary judgment and, accordingly, it is for the jury to decide which witness' testimony to credit as to the feasibility or historical practice of MMC employees working from home. *Manganiello v. City of New York,* 612 F.3d 149, 161 (2d Cir. 2010) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.") (citation omitted). Although to permit an employee to work from home may constitute an "extraordinary accommodation" and, thus, one which may be deemed unreasonable in certain situations, should the jury determine that other CMO employees were permitted and able to work from home as of the time that Mrs. Vangas allegedly requested to do so, such a

request by Mrs. Vangas may not be deemed "unreasonable" or unduly burdensome to MMC.[12]

### c. Material Issues of Fact Exist as to Whether Defendants Engaged in an Interactive Process

Plaintiff argues that Defendants failed to engage in an "interactive process" in response to her communications regarding her inability to return to work on August 30, as well as her August 20 request to work from home. Pls.' Mem. L. Opp. 10-12, 14-15. The Second Circuit has held that under the ADA, failure to engage in an interactive process does not form the basis of a disability discrimination claim in the absence of evidence that a reasonable accommodation was possible. *McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 100-01 (2d Cir. 2009). Unlike the ADA, however, under the NYSHRL and NYCHRL, an employer's failure to engage in the interactive process is itself a violation of the law. *See Phillips*, 66 A.D.3d at 176-77 (holding that under the NYSHRL and NYCHRL, "the first step in providing a reasonable accommodation is to engage in a good faith interactive process that assesses the needs of the disabled individual and the reasonableness of the accommodation requested" and that "failure to consider the accommodation . . . is a violation of [the NYSHRL]" and the NYCHRL); *see also Martin v. United Parcel Serv. of Am., Inc.*, 104 A.D.3d 1173, 1174-75 (4th Dep't 2013) (holding that the trial court "properly determined that defendant failed to eliminate all triable issues of fact," including "whether defendant engaged in an interactive process to ascertain plaintiff's needs and whether a reasonable accommodation was possible"); *Jochelman v. New York State*

---

[12] With respect to Defendants' argument that Mrs. Vangas was not physically well enough to perform the essential functions of her job from home, the Court finds that questions of fact exist as to that issue as well. First, during her deposition, Mrs. Vangas implied that the reason she requested to work from home on August 20 was because at the time, she was undergoing radiation and chemotherapy and had "constant diarrhea." Goldring Decl., Ex. A at 156:2-8. Such a symptom does not suggest that, as a matter of law, Mrs. Vangas would not be able to perform her job from home via remote access. Moreover, although Defendants contend that Mrs. Vangas could not have performed her job because she had developed "blurry vision and other new symptoms around the time she requested to work from home," Defs.' Reply Mem. L. 8, the Court cannot find, as a matter of law, that these newly-developed symptoms precluded her from performing the essential functions of her job if permitted to do so from home.

*Banking Dep't*, 920 N.Y.S.2d 661, 661-62 (1st Dep't 2011) (holding that issues of fact precluded summary judgment on plaintiff's claim that defendant failed to "engage[] in the good faith interactive process required by the [NYSHRL]"); *Morse v. JetBlue Airways Corp.*, 941 F. Supp. 2d 274, 302 n.16 (E.D.N.Y. 2013) ("Unlike the ADA, under the NYSHRL and the NYCHRL, an employer's failure to engage in the interactive process is, by itself, a violation of the law.") (citing *Phillips*, 66 A.D.3d at 176).

The "interactive process" requirement requires the employer to "investigate an employee's request for accommodation and determine its feasibility." *Phillips*, 66 A.D.3d at 176. An interactive process may involve a "meeting with the employee who requests an accommodation, requesting information about the condition and what limitations the employee has, asking the employee what he or she specifically wants, showing some sign of having considered the employee's request, and offering and discussing available alternatives when the request is too burdensome." *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 218-19 (2d Cir. 2001) (internal quotation marks, brackets and citation omitted). The interactive process has been described as "the key mechanism for facilitating the integration of disabled employees into the workplace." *Phillips*, 66 A.D.3d at 175 (quoting *Barnett v. U.S. Air*, 228 F.3d 1105, 1116 (9th Cir. 2000) (en banc), *vacated on other grounds* 535 U.S. 391 (2002)). Without it,

> many employees will be unable to identify effective reasonable accommodations. Without the possibility of liability for failure to engage in the interactive process, employers would have less incentive to engage in a cooperative dialogue and to explore fully the existence and feasibility of reasonable accommodations. The result would be less accommodation and more litigation, as lawsuits become the only alternative for disabled employees seeking accommodation. . . . Therefore, summary judgment is available only where there is no genuine dispute that the employer has engaged in the interactive process in good faith.

*Id.* (citing *Barnett*, 228 F.3d at 1116).

Here, Plaintiff contends that Defendants failed to determine the feasibility of her request to work from home, as well as to engage in an interactive process regarding her request for additional time.  According to Mrs. Vangas, Ms. Quinn did not return her August 29 text message or phone call informing her that she was experiencing certain symptoms and would not be able to return to work the following day.  Vangas Decl. ¶¶ 39-40.  Indeed, Defendants admit that in response to Mrs. Vangas' August 29 text message, Ms. Byrne filled out a Leave and Termination Form terminating Mrs. Vangas' employment effective August 30.  Goldring Decl., Ex. L.  Moreover, the record suggests that prior to filling out the paperwork terminating Mrs. Vangas on August 30, *none* of the Defendants responded to Mrs. Vangas' messages that she was unable to return to work as scheduled.  Indeed, according to Mrs. Vangas, she was only alerted to the fact that her job was in jeopardy from her friend and co-worker, Ms. Maloney—a non-party to this action.  Vangas Decl. ¶¶ 41-43.

Moreover, although Defendants contend that they engaged in an interactive process because Ms. Burns did not actually *submit* the Leave and Termination Form to Human Resources until after she spoke with Mrs. Vangas on August 31 or September 1, the Form nevertheless clearly lists August 30 as Mrs. Vangas' termination date and, indeed, Defendants *admit* that Mrs. Vangas was no longer employed by MMC as of August 30, 2010.  Reice Decl., Ex. D at 98:18-23, 99:20-100:5; *see also* Goldring Decl., Exs. B at 128:16-129:3, 130:22-132:11; C at 66:11-67:9, 93:4-8, 98:8-11; L; *see also* Defs.' 56.1 Stmt. ¶ 48.  Accordingly, the Court finds that issues of material fact exist as to whether Defendants participated in the "interactive process" required under the NYSHRL and NYCHRL with respect to Mrs. Vanagas'

communications with Defendants prior to her scheduled August 30 return-to-work date.[13]

Finally, with respect to Mrs. Vangas' request to work from home, although Ms. Quinn denies that the request was ever made, this Court is obligated to draw all inferences in Mrs. Vangas' favor on Defendants' motion for summary judgment. *See Brod*, 653 F.3d at 164. Accordingly, crediting Mrs. Vangas' version of events, the Court finds that material issues of fact exist as to whether Defendants satisfied their obligation to determine the feasibility of Mrs. Vangas' request. Indeed, according to Mrs. Vangas, Ms. Quinn did not inquire into the feasibility of her request to work from home and, rather, simply indicated that "Kathleen Byrne would not go for it." Vangas Decl. ¶ 36. As Defendants had an obligation to investigate Mrs. Vangas' request for accommodation and determine its feasibility, *Phillips*, 66 A.D.3d at 176, and issues of fact regarding Defendants' response to Mrs. Vangas' request exist, Defendants are not entitled to summary judgment on Plaintiff's claim that Defendants failed to engage in an interactive process regarding her request to work from home.[14]

---

[13] Although the Court determined *supra* that Plaintiffs' requests for indefinite leave were unreasonable as a matter of law under the NYSHRL, such a finding does not suggest that Mrs. Vangas' claim that Defendants refused to engage in an interactive process must necessarily fail. Indeed, had Defendants engaged with Mrs. Vangas upon her informing them that she would not be able to return on August 30 due to her new symptoms—rather than simply terminating Mrs. Vangas and filling her position—Plaintiff and Defendants may have been able to collectively identify potential alternative accommodations more reasonable and less burdensome than an indefinite leave of absence.

[14] Defendants vaguely contend that it was *Mrs. Vangas* who failed to engage in an interactive process by failing to keep Defendants apprised of her status during the course of her medical leave. Defs.' Reply Mem. L. 7-10. However, it is undisputed that Defendants granted Mrs. Vangas' request for medical leave upon her diagnosis, and unilaterally extended her leave until the agreed-upon date of August 30, 2010. Plaintiff complains of Defendants' failure to engage in an interactive process in late August 2010—toward the end of her agreed-upon leave time. Defendants do not dispute that with respect to this time period, Plaintiff did, in fact, reach out to Defendants in various ways. Accordingly, Plaintiff's previous alleged failures to communicate with Defendants during the course of her medical leave is immaterial to the Court's determination of the sufficiency of Defendants' response to Plaintiff's communications toward the scheduled end of her leave. Moreover, with respect to Defendants' argument that Plaintiff failed to ask for any alternative form of accommodation, Defs.' Reply Mem. L. 9, that argument is unavailing. Defendants had the obligation to engage in a dialogue with Mrs. Vangas in order to discuss her situation to attempt to find accommodations that were reasonable and not unduly burdensome to MMC. The record suggests that Defendants failed to engage in that conversation and, accordingly, Mrs. Vangas was not even afforded the opportunity to suggest alternative accommodations or specifically identify her needs.

## V.    Plaintiff's New York Labor Law Claims

Plaintiff claims that, in violation of NYLL §§ 195 and 217, Defendant MMC failed to timely notify her in writing of the date of her termination, as well as the date of cancellation of her employee benefits.  Compl. ¶¶ 109-116.  Section 195 of the NYLL requires employers to "notify any employee terminated from employment, in writing, of the exact date of such termination as well as the exact date of cancellation of employee benefits connected with such termination" within "five working days after the date of such termination."  NYLL § 195(6). Section 217(1) states, in turn, that an individual who does not receive the requisite notice of termination and cancellation of benefits under § 195(6) shall be entitled to "appropriate damages which shall include reimbursement for medical expenses which were not covered by the policyholder's insurer by virtue of his termination of the policy."  NYLL § 217(7)(b).

MMC argues that it is not liable under the NYLL because it is undisputed that it gave Mrs. Vangas written notice of her termination and the cancellation of her benefits, albeit not within five days of Mrs. Vangas' termination.  Defs.' Mem. L. 22.  According to MMC, the legislative intent of the NYLL provisions at issue is to punish employers who "refuse[] to give such notice" and, as MMC is clearly not an employer who "refused" to give notice of Mrs. Vangas' termination, the provisions should not apply to it.  *Id.*  Finally, MMC argues that it should not be held liable for any violations of the NYLL, as Mrs. Vangas suffered no damages as a result of any delay.  *Id.* at 23.  Specifically, MMC argues that Mrs. Vangas was covered by her husband's insurance upon her termination, and that the amount of medical expenses she paid out of her own pocket were *de minimis*.  *Id.* at 22-23 (citing *Hugo v. A & A Maint. Enter., Inc.*, 702 N.Y.S.2d 387, 388 (2d Dep't 2000) ("Since there is no evidence that the plaintiffs sustained any damages as a result of the defendant's violation of Labor Law § 195(6), the Supreme Court

33

properly granted summary judgment to the defendant dismissing the complaint.")).

Plaintiff, on the other hand, argues that it is undisputed that she was terminated effective August 30, 2010, however, she did not receive the "termination of benefits letter" from MMC until October 2010, which was dated September 23 (i.e., more than five days after the termination of her employment).  Pls.' Mem. L. Opp. 23-24.  Accordingly, Defendants are clearly liable under the NYLL for failure to give notice of her termination and cancellation of benefits within five days of her termination.  Moreover, Plaintiff disputes MMC's contention that she did not incur any expenses as a result of MMC's delay in providing her with the appropriate notification.  To the contrary, she contends that she and her husband incurred "thousands of dollars in medical bills from September 2010," which they have not been able to pay.  *Id.* at 24.

The Court finds that the undisputed evidence demonstrates that MMC violated the clear terms of Section 195(6) of the NYLL by failing to provide Mrs. Vangas with written notification of the exact date of her termination and the cancellation of her benefits within five days of her termination.  Defendants admit that Mrs. Vangas was terminated effective August 30, 2010, however, the letter MMC sent to Mrs. Vangas informing her of the "status of [her] benefits following [her] last day of employment at [MMC]" is dated September 23, 2010—more than five days after the date of her termination.  Vangas Decl., Ex. D.  Moreover, the Court notes that the letter does not indicate the *exact* date of Mrs. Vangas' termination, as required by the NYLL.  Rather, it simply states that Mrs. Vangas' benefits would continue "through the end of the month of [her] last official day as a Montefiore associate."  *Id.*  Finally, although Defendant contends that Mrs. Vangas only incurred minimal *out-of-pocket* expenses as a result of the delay in notification, it does not contest Mrs. Vangas' contention that she has incurred significant medical bills which she has been *unable to pay* as a result of her loss of benefits.  Vangas Decl. ¶ 58.

34

Accordingly, it is an incorrect characterization of Mrs. Vangas' testimony to suggest, as MMC does, that she has sustained *no* damages as a result of Defendant's violation. Thus, as MMC did not notify Mrs. Vangas of her termination and the cancellation of her benefits within five business days of her termination, and as material issues of fact exist as to the damages Mrs. Vangas incurred as a result of MMC's failure to provide her with timely notice, MMC's motion for summary judgment on Plaintiff's NYLL claims is DENIED.

**VI.   Conclusion**

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED in part and DENIED in part. Specifically, Defendants are granted summary judgment on Plaintiff's failure to accommodate claim under the NYSHRL. Defendants' motion for summary judgment on the following claims is denied: (i) failure to accommodate under the NYCHRL; (ii) failure to engage in an interactive process under the NYSHRL and NYCHRL; (iii) violation of COBRA; and (iv) violation of the NYLL. The Clerk of the Court is respectfully directed to terminate the motion. Doc. 54.

The parties are instructed to file their joint pre-trial order no later than April 17, 2014 and to appear for a pre-trial conference on April 22, 2014 at 10:00 am, at which a final pretrial conference date and trial date will be set.

It is SO ORDERED.

Dated:   March 20, 2014
         New York, New York

Edgardo Ramos, U.S.D.J.