UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------x

MIRELLE VANGAS and ALFREDO VANGAS, JR., :
                                                :

               Plaintiffs,           :

                                                :

         -against-              :         **OPINION AND ORDER**

                                                :

MONTEFIORE MEDICAL CENTER, ELIZABETH   :        11 Civ. 6722 (ER)
BURNS, PATRICIA QUINN, and WAGEWORKS, INC., :

                                                  :

              Defendants.         :

----------------------------------------------------------------------x

Ramos, D.J.:

       Plaintiff Mirelle Vangas was diagnosed with cancer on March 25, 2010.  She was

terminated by her employer Montefiore Medical Center ("MMC") on August 30, 2010, after she

exhausted her Family Medical Leave Act leave of absence and was unable to return to work.

Mrs. Vangas brought this action against MMC, Elizabeth Burns and Patricia Quinn

("Defendants"),[1] alleging, *inter alia*, that Defendants failed to accommodate her disability in

violation of the New York State Human Rights Law ("NYSHRL"), as well as failed to notify her

of the cancellation of her employee benefits within five days of her termination from MMC in

violation of the New York Labor Law ("NYLL").  Following a five-day trial in June 2014, the

Court granted judgment as a matter of law to Mrs. Vangas on the NYLL claim.  The jury then

found in Mrs. Vangas' favor on the NYSHRL claim,[2] and awarded damages in the total amount

---

[1] On February 21, 2013, the claims for relief against Defendant WageWorks, Inc. were voluntarily dismissed.  Doc. 46.

[2] Mrs. Vangas similarly alleged that Defendants failed to accommodate her disability in violation of the New York City Human Rights Law ("NYCHRL").  During the trial, the Court dismissed the NYCHRL claim for lack of subject matter jurisdiction.

Mrs. Vangas, along with her husband Alfredo Vangas, Jr., also brought a claim under the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), alleging that MMC failed to properly send notification of their right to continue coverage under MMC's medical plan following Mrs. Vangas' termination.  By Opinion and Order dated November 5, 2014, the Court found in favor of Defendant MMC on the COBRA claim.  Doc. 125.

of \$541,000.[3]  Pending before the Court are Defendants' post-trial motions in connection with

the NYSHRL claim.[4]  Doc. 126.  Specifically, Defendants seek (i) judgment as a matter of law

under Rule 50 of the Federal Rules of Civil Procedure, (ii) an order vacating the jury's verdict

and dismissing Mrs. Vangas' NYSHRL claim under Rule 59(e) and Rule 60(b)(6), (iii) a new

trial pursuant to Rule 59(a) and Rule 60(b)(6), or (iv) remittitur of the compensatory, back pay,

and front pay damages awards.  For the reasons set forth below, Defendants' motions are

GRANTED in part and DENIED in part.

**I.     Facts Adduced at Trial**

   a.  *Mrs. Vangas' Employment at MMC and Termination*

       Mirelle Vangas, an employee of MMC since 1989, was diagnosed with anal cancer on

March 25, 2010.  Transcript of Trial ("Tr.") 78:14-15, 79:2; Defs.' 56.1 Stmt. ¶ 2.  At the time of

her diagnosis, Mrs. Vangas was a utilization management analyst in MMC's Care Management

Organization ("CMO"), with responsibilities that included assisting with authorizations for

inbound patients and making phone calls to patients who had been discharged from the hospital.

*Id.* 75:16-22.  Mrs. Vangas took an immediate leave of absence from MMC upon her diagnosis.

*Id.* 78:18-21.

       Mrs. Vangas completed Family and Medical Leave Act ("FMLA") forms, which

provided for a leave period of three months, concluding at the end of June 2010.  *Id.* 226:20.  On

June 14, 2010, Mrs. Vangas saw her oncologist, who noted in a report to MMC's short-term

disability provider that Mrs. Vangas' new return to work date would be July 19, 2010.  *Id.*

---

[3] The jury awarded Mrs. Vangas damages as follows:  \$155,000 in the form of back pay for the NYSHRL claim;
\$190,000 in the form of front pay for the NYSHRL claim; \$181,000 in compensatory damages for the NYSHRL
claim; and \$15,000 in connection with the NYLL claim.

[4] Defendants do not challenge the judgment or the jury award on the NYLL claim.

89:11.[5]

In July 2010, Ms. Quinn, who was Plaintiff's direct supervisor, and Kathleen Byrne, MMC's Director of Medical Management,[6] advised Ms. Burns that they were not sure when Mrs. Vangas would be returning to work. Tr. 358:18-21. Accordingly, Ms. Burns, who is in charge of all Human Resources functions in the CMO, advised Ms. Quinn and Ms. Byrne to send a letter to Mrs. Vangas regarding her FMLA leave. *Id.* 353:13, 353:25-354:2, 358:22-23. Ms. Burns testified that this letter was sent on or around July 22, 2010. *Id.* 359:24-360:2.[7]

On July 26, 2010, Mrs. Vangas called and left a message for Ms. Burns because she was confused about what she needed to do next regarding her medical leave. *Id.* 93:1-7, 104:15-18. Ms. Burns testified that after Jackie Colon, Ms. Burns' secretary, advised that Mrs. Vangas had called and was confused about the leave process, Ms. Burns directed Ms. Colon to return the call and let Mrs. Vangas know that MMC had not yet received her FMLA paperwork. *Id.* 359:4-8, 361:9-17. Ms. Burns confirmed that she did not personally return Mrs. Vangas' call. *Id.* 361:13.

According to Mrs. Vangas, she "played phone tag" with Ms. Colon for several days. *Id.* 104:19-23. Mrs. Vangas attempted to reach Ms. Colon on July 28, July 30, and August 2. *Id.* 106:2-17.

On August 3, 2010, Mrs. Vangas' radiation oncologist, Dr. William Bodner, completed a disability form indicating that her expected return to work date was August 30, 2010. *Id.* 235:13. Also on August 3, 2010, Mrs. Vangas was finally able to speak to Ms. Colon. *Id.* 106:23.

---

[5] When Mrs. Vangas was unable to return to work at the scheduled end of her FMLA leave in June 2010, Defendants unilaterally extended her leave. Tr. 138:22.

[6] Ms. Quinn reports directly to Ms. Byrne. Tr. 311:17-312:2.

[7] Ms. Burns testified that this letter was never received by Mrs. Vangas; instead it was returned to MMC as unclaimed. Tr. 363:20-22.

According to Mrs. Vangas, Ms. Colon advised that she would mail the FMLA paperwork again, and that Mrs. Vangas would need to complete the forms upon receipt. *Id.* 109:7-8, 109:17. Mrs. Vangas then informed Ms. Colon that her next appointment with the oncologist was not until August 23 and that she would have the papers filled out then, to which Ms. Colon "did not protest." *Id.* 109:8-13.

Mrs. Vangas testified that on August 5, 2010, she spoke to Ms. Quinn by telephone and asked if she could work from home. *Id.* 236:9. Mrs. Vangas sought the accommodation because of her medical symptoms, which included constant diarrhea. *Id.* 236:13-16. Mrs. Vangas testified that Ms. Quinn said that she personally "had no problem" with Mrs. Vangas' proposal, but that Ms. Byrne "wouldn't go for that." *Id.* 111:12-13.[8] Contrary to Mrs. Vangas' testimony, Ms. Quinn testified that Mrs. Vangas never asked her if she could work from home, however.

---

[8] Mrs. Vangas testified that certain supervisory employees of MMC, including Ms. Quinn, Mary Jo Maloney, and Patricia Mastrangelo, were allowed to work from home at times during their employment. Tr. 243:3-11. Plaintiff testified that her job primarily involved outreach to MMC patients by telephone, and that certain of MMC's computer programs could be accessed remotely, including Care-Enhanced Clinical Management Software ("CCMS"), a system used to record interactions with patients in the CMO. *Id.* 113:24-114:20, 115:6-13, 115:19-21; *see also id.* 407:17-20 (K. Byrne). CCMS contains each CMO patient's name, address, and age, as well as details regarding the patient's hospital admission. *Id.* 115:2-116:21. Mrs. Vangas also testified that every MMC employee could also remotely access MMC's internal e-mail system. *Id.* 115:2-3, 115:18-21.

According to the testimony of Ms. Byrne, utilization management analysts were unable to work from home at the time of Mrs. Vangas' employment: "That was not part of what they were allowed to do because we did not have appropriate systems, firewalls for confidential information, and we had no HR policies at that time for staff to work from home." *Id.* 437:18-21. Ms. Byrne testified that "[t]here are an awful lot of things [that] have to [be] set up before you can have someone work from home," including that the arrangement must be "ergonomically safe" and HIPAA-compliant. *Id.* 437:22-25. And while staff-level employees were not allowed to work from home during the period of Mrs. Vangas' employment, certain MMC staff members were permitted to work from home at a certain point between Plaintiff's termination and the trial of this matter. *Id.* 438:3-4. This arrangement, however, took approximately a year and a half of planning. *Id.* Ms. Byrne also confirmed that Ms. Quinn, Ms. Maloney, and Ms. Mastrangelo intermittently worked from home, and that it was possible to use CCMS remotely. *Id.* 440:7-15, 440:24-25. According to Ms. Byrne, however, no MMC employee was allowed to remotely access Carecast, a system that provides clinical information for each MMC patient. *Id.* 441:4-5.

*Id.* 336:8-13, 336:23-24.[9]  And according to Ms. Byrne, Ms. Quinn never told her about such a request, and Ms. Quinn was never asked whether working from home would have been an option for Mrs. Vangas.  *Id.* 441:10-18.

On August 20, 2010, Ms. Quinn sent Mrs. Vangas a text message directing her to call Ms. Colon regarding the FMLA paperwork.  *Id.* 128:20-129:2.  Upon receipt of the text message, Mrs. Vangas called Ms. Quinn and stated that she had already told Ms. Colon that a follow-up medical appointment was scheduled for August 23, 2010.  *Id.* 129:11-16.  Mrs. Vangas then asked if she was losing her job; Ms. Quinn answered in the negative, and advised that the forms were sent in order to extend Mrs. Vangas' leave period.  *Id.* 129:17-19.

In late August 2010, Mrs. Vangas experienced newly-developed symptoms, including blurred vision, facial swelling, and headaches.  *Id.* 130:3-4.  On August 23, Mrs. Vangas saw Dr. Bodner in connection with the new symptoms.  *Id.* 136:9-16.

On August 26, 2010, Mrs. Vangas called Ms. Quinn to advise of the newly-developed symptoms.  *Id.* 132:19-21.  According to Plaintiff, she told Ms. Quinn that she did not know if she would be able to return to work on August 30, 2010.  *Id.* 132:22-24.

On August 29, 2010, a Sunday, Mrs. Vangas left a voicemail message for Ms. Quinn, advising that she would not be able to return to work the next day.  *Id.* 133:7-10.  Ms. Quinn did not return the message.  *Id.* 133:11-12.  Mrs. Vangas also sent Ms. Quinn a text message that day, informing that she did not feel good and would follow up with her doctors.  *Id.* 133:13-14.  Ms. Quinn did not return the text message.  *Id.* 134:12.

---

[9] Despite Ms. Quinn's testimony at trial that such a request was never made, Ms. Quinn testified at her deposition that she could not recall whether Mrs. Vangas asked to work from home.  Tr. 336:23-24.  According to Ms. Quinn, she changed her testimony because she had a chance between the deposition and trial to review her notes regarding Mrs. Vangas' employment.  *Id.* 337:8-12.

Mrs. Vangas did not return as scheduled on August 30, 2010. *Id.* 136:9-21, 248:24. MMC terminated Mrs. Vangas that same day. *Id.* 443:8.

Late in the afternoon on August 30, 2010, Ms. Maloney, a manager at MMC and one of Mrs. Vangas' friends, called Mrs. Vangas and alerted her that "something was going on." *Id.* 136:23-25. Ms. Maloney told Mrs. Vangas that there was discussion in a meeting that morning of offering Mrs. Vangas' job to the temporary employee who had replaced her during the leave period. *Id.* 137:2-4.[10]

On the morning of August 31, Mrs. Vangas called and left a message for Ms. Burns. *Id.* 137:8-138:5. After receiving no response, Mrs. Vangas called again a few hours later, at which point Ms. Colon answered the phone. *Id.* 138:6-8. When Mrs. Vangas identified herself, Ms. Colon asked if she was calling "regarding . . . handing in your badge and key." *Id.* 138:11-14. Mrs. Vangas responded in the negative, and said that she was calling "regarding [her] papers" and asked to speak to Ms. Burns. *Id.* 138:14-15. According to Mrs. Vangas, she told Ms. Burns that she had heard her position was being filled. *Id.* 138:19-22. After Ms. Burns stated that Mrs. Vangas' FMLA leave period was twelve weeks, Mrs. Vangas said that MMC had extended the period. *Id.* 138:21-22. According to Mrs. Vangas, she then told Ms. Burns that she was not medically cleared to return to work but would "do what [she] had to do" to save her job. *Id.* 249:15-16.[11] Mrs. Vangas testified that she asked Ms. Burns if the position would be open the following day if her husband took her to work. *Id.* 139:4-7. According to Mrs. Vangas, Ms. Burns responded by saying that she did not know of a replacement for the position and that there

---

[10] Ms. Quinn testified that she took part in the decision to fill Mrs. Vangas' position. Tr. 349:6.

[11] Ms. Burns similarly testified that Mrs. Vangas stated during this conversation that she did not have a return to work date and was not medically cleared to return. Tr. 556:22-557:7.

was no posting for the job. *Id.* 139:1-4.  Mrs. Vangas then asked if that meant that she could

have her job back if she called Ms. Quinn. *Id.* 139:6-8.  Ms. Burns stated that Mrs. Vangas

would have to "work that out" with Ms. Quinn. *Id.*[12]

      Mrs. Vangas testified that after her conversation with Ms. Burns, she called Ms. Quinn to

ask if her job was still available. *Id.* 140:14-15.  Ms. Quinn said that she would have to speak

with Ms. Byrne and would call Mrs. Vangas back. *Id.* 140:17-21.  According to Mrs. Vangas,

after she did not hear from Ms. Quinn, she called Ms. Quinn three more times that day. *Id.*

140:23-141:1.  Ms. Quinn finally picked up on the third try after Mrs. Vangas had blocked her

phone number. *Id.*  When Mrs. Vangas asked whether Ms. Quinn had been able to speak to Ms.

Byrne about the job posting, Ms. Quinn stated that she could not talk to Mrs. Vangas anymore

and that Mrs. Vangas would have "to deal with Human Resources." *Id.* 141:3-7.[13]

b. *Mrs. Vangas' Post-Termination Employment*

      On September 13, 2010, Mrs. Vangas interviewed for a position at MMC's Emerging

Health Information Technology ("EHIT") affiliate. *Id.* 145:14-16.  Mrs. Vangas was not offered

the EHIT position. *Id.* 170:21.  After that, Mrs. Vangas was offered a position with Terminix

International Company, an exterminator, and started work on or around October 11, 2010. *Id.*

171:3-7.  According to Mrs. Vangas, the job involved inspecting homes for termites, including

climbing up and down ladders into attics and basements, which was physically demanding. *Id.*

---

[12] Ms. Burns testified that she told Mrs. Vangas during this conversation that her job was being filled and that she should contact Ruben Vargas, an employee in MMC's human resources department, when she was medically cleared to return to work.  Tr. 371:21-372:13.  Ms. Burns testified that she did not know the status of Mrs. Vangas' medical condition or ask Mrs. Vangas about her health or limitations. *Id.* 372:19-25.  According to Ms. Burns, she did not ask Mrs. Vangas "what she specifically want[ed]" because Mrs. Vangas was not medically cleared to return to work. *Id.* 373:1-4.

[13] Ms. Burns testified that she and Ms. Quinn did not have the authority to hire or terminate; make employment policy; promote or demote MMC employees; or determine any employee's salary.  Tr. 559:6-560:11.

171:9-13.  Mrs. Vangas resigned from Terminix approximately two months later.  *Id.* 171:15, 256:22.

Mrs. Vangas thereafter briefly worked at Rockland Orthopedics, resigning because she needed more stable hours to care for her daughter.  *Id.* 174:8-12.  About one month later, Mrs. Vangas started work through a temp agency at a law firm.  *Id.* 174:14-18.  Mrs. Vangas was an employee of the law firm at the time of trial.  *Id.* 174:20.[14]

c.  *Evidence of Mrs. Vangas' Emotional Distress*

Plaintiff testified to the emotional impact of her termination.  According to Mrs. Vangas, she was excited to return to work on August 30, 2010.  *Id.* 125:2-5.  She could not wait to see her co-workers and "get back into the groove of being around people" after her time spent at home recovering.  *Id.*  However, after her termination, Mrs. Vangas felt worthless—she did not know where to go because she did not have a college degree and was also having trouble finding a job. *Id.* 182:2-5.  Mrs. Vangas was very emotional, cried frequently, could not sleep, and gained about 50 pounds.  *Id.* 182:5-14.  According to Plaintiff, her termination affected every part of her life and was very hard to accept.  *Id.* 182:7-11.  She secluded herself because she did not want to be around her family.  *Id.* 182:11.  Mrs. Vangas did not, however, see a psychologist, take medication, or consult with a social worker or mental health professional as a result of her termination.  *Id.* 257:14-20.

Mr. Vangas corroborated his wife's testimony.  According to Mr. Vangas, his wife was

---

[14] According to Defendants, Mrs. Vangas earned approximately $80,000 from the date of her termination from MMC until the date of the verdict, including approximately $73,000 from her job at the law firm.  Defs. Mem. L. 27.

While Mrs. Vangas' annual salary at MMC at the time of her termination was $49,175.62, her salary at the time of trial was $32,618.13.  Am. Joint Pretrial Order at 6; Pls. Ex. 49.  Mrs. Vangas also testified that she had health benefits and dental insurance at MMC, but was insured through her husband's job at the time of trial.  Tr. 174:25-175:5, 175:10-13.

"happy-go-lucky" before her cancer diagnosis.  *Id.* 459:10.  She loved her job and would come

home happy every day.  *Id.* 459:10-11.  In August 2010, Mrs. Vangas was eager to return to

work.  *Id.* 460:15-17.  After her termination, he described her as upset, confused, and hurt

because she had devoted 20 years of her life to her employer.  *Id.* 461:7-9.  She became more

worried about home life and stressed about the family's finances, and she lacked confidence

because she was not contributing as much financially.  *Id.* 461:17-19, 462:1-3.

## II.    The Jury Charge

The jury was charged that "[f]or Mrs. Vangas to succeed under her [NYSHRL] claim, she

must establish by a preponderance of the evidence that:  [o]ne, she was disabled as defined by

the [L]aw; [t]wo, her employers had notice of the disability; [t]hree, with reasonable

accommodation, she could have performed the essential functions of her job; and [f]our, the

defendants refused to make reasonable accommodations for her needs."  *Id.* 733:23-734:7.[15]

They were further instructed that because "there [was] no dispute that Mrs. Vangas was disabled

as defined by the [L]aw and that her employers had notice of the disability, . . . the only two

elements that you must decide are whether, with a reasonable accommodation, Mrs. Vangas

could have performed the essential functions of her job and whether the defendants refused to

make reasonable accommodation for her needs."  *Id.* 734:8-14.  The Court advised that the

NYSHRL claim must be supported by "substantiated allegations that, upon provision of

reasonable accommodations, the employee could perform the essential functions of her job, and

the employee bears the burden of proving this issue."  *Id.* 734:23-735:1.  The jury was also told

---

[15] *See Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 332 n.1 (2d Cir. 2000) (stating that to succeed on a reasonable accommodation claim, the plaintiff must establish, by a preponderance of the evidence, that (1) she was disabled as defined by the Law; (2) her employers had notice of the disability; (3) with reasonable accommodation, she could have performed the essential functions of her job; and (4) the defendants refused to make reasonable accommodations for her needs).

that it "may not consider any request by Mrs. Vangas for indefinite leave under the [NYSHRL] claim." *Id.* 733:20-22.

The Court instructed the jury about the interactive process under the NYSHRL:  that "the employer's decision to engage in or forgo an interactive process, or put another way, a dialogue with the employee, is one factor to be considered in determining whether a reasonable accommodation was available for the employee's disability at the time the employee sought accommodation." *Id.* 735:15-19.  Moreover, "[t]he employer's failure to [hold a] constructive dialogue about the possibility of a reasonable accommodation may indicate that the employer has discriminated because of an individual's disability within the meaning of the [NYSHRL]." *Id.* 735:20-24.  The Court specified that "[a]n interactive process may involve meeting with the employee who requests an accommodation, requesting information about the condition and what limitations the employee has, asking the employee what he or she specifically wants, showing some sign of having considered the employee's request, and offering and discussing available alternatives when the request is too burdensome." *Id.* 736:1-7.  The Court also instructed that "[a]rguments made by the attorneys are not evidence because the attorneys are not witnesses," and that "what [counsel] have said to you in their opening statements and their summations is intended to help you understand the evidence to reach your verdict." *Id.* 746:18-22.

## III.   Discussion

### a.  *Rule 50(a) and (b)*

Rule 50(a) of the Federal Rules of Civil Procedure permits a district court to grant judgment as a matter of law on a claim if "a reasonable jury would not have a legally sufficient evidentiary basis" to find for one party on a particular issue, and the claim cannot be maintained without proof of that issue.  Fed.R.Civ.P. 50(a).  A motion for judgment as a matter of law under

Rule 50(a) must be made before the case is submitted to the jury and must specify the judgment sought and the law and facts that entitle the movant to the judgment.  *Id.*  "If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion."  Fed.R.Civ.P. 50(b).

A Rule 50(a) motion specifying certain law and facts entitling the movant to judgment does not allow the moving party to make a "renewed" post-trial motion, under Rule 50(b) based on an entirely different argument.  *Lore v. City of Syracuse*, 670 F.3d 127, 152 (2d Cir. 2012).  Rather, a post-trial motion is limited to those grounds that were specifically raised in the prior motion for judgment as a matter of law; the movant is not permitted to add new grounds after trial.  *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001).  "As to any issue on which proper Rule 50 motions were not made, [judgment as a matter of law] may not properly be granted . . . unless that action is required in order to prevent manifest injustice."  *Lore*, 670 F.3d at 152.

When a Rule 50(b) motion is properly submitted, the district court can grant the motion only if, after viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in favor of the non-moving party, it finds that there is insufficient evidence to support the verdict.  *Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 119 (2d Cir. 2004) (internal citation omitted).  The court cannot set aside the jury's credibility findings and cannot find for the movant based on evidence the jury was entitled to discredit.  *Id.*

b.  *Rule 59(a) and (e)*

In order for the Court to order a new trial under Rule 59(a), it must conclude that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice, *i.e.*, it must view the jury's verdict as against the weight of the evidence.  *Mugavero v. Arms Acres, Inc.*, 680

F. Supp. 2d 544, 558 (S.D.N.Y. 2010) (quoting *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003)).  The Rule 59(a) standard is less stringent than the standard for granting judgment as a matter of law under Rule 50 in two significant respects:  (1) a new trial under Rule 59(a) may be granted even if there is substantial evidence supporting the jury's verdict, and (2) a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner. *Id.* (quoting *Manley*, 337 F.3d at 244-45).  Yet, "[i]n weighing the evidence … the Court should not ordinarily ignore the jury's role in resolving factual disputes and assessing witness credibility."  *Id.* at 558–59 (internal quotation marks and citation omitted).  A court should only grant a Rule 59 motion for a new trial when the jury's verdict is "egregious," and thus should rarely disturb a jury's evaluation of witness credibility.  *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133-34 (2d Cir. 1998) (citations omitted); *accord Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012) (holding that the jury's evaluation of witness credibility merits a "high degree of deference," and "jury verdicts should be disturbed with great infrequency"), *cert. denied*, 133 S. Ct. 789 (2012).  Indeed, the Second Circuit has held that "[w]here the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial."  *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir. 1992), *abrogated on other grounds as noted in Yung v. Lee*, 432 F.3d 142, 147 (2d Cir. 2005); *see also, e.g.*, *Zhiwen Chen v. Cnty. of Suffolk*, 927 F. Supp. 2d 58, 67 (E.D.N.Y. 2013) (holding that "it would be improper to grant a new trial under these circumstances as the issue of the force exercised by defendants was dependent on the assessment of the credibility of the witnesses").  "[O]ur precedent counsels that trial judges must exercise their ability to weigh credibility with caution and great restraint, as a judge … may not 'freely substitute his or her assessment of the credibility of witnesses for that

of the jury simply because the judge disagrees with the jury.'" *Raedle*, 670 F.3d at 418 (internal citation omitted).

Additionally, a motion to alter a judgment pursuant to Rule 59(e) "may be granted 'only if the movant satisfies the heavy burden of demonstrating an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *Fireman's Fund Ins. Co. v. Great Am. Ins. Co.*, 10 F. Supp. 3d 460, 475 (S.D.N.Y. 2014) (quoting *Hollander v. Members of the Bd. of Regents of the Univ. of the State of N.Y.*, 524 F. App'x 727, 729 (2d Cir. 2013)).

c.   *Rule 60(b)(6)*

Rule 60(b)(6) provides relief from a final judgment or order for "any other reason that justifies relief." Fed.R.Civ.P. 60(b)(6). A motion under Rule 60(b) is addressed to the sound discretion of the trial court and may be granted only on a showing of exceptional circumstances. *Zargary v. City of New York*, No. 00 Civ. 897 (RJH), 2010 WL 329959, at *2 (S.D.N.Y. Jan. 26, 2010), *aff'd*, 412 F. App'x 339 (2d Cir. 2011); *see also Rodriguez v. Kuhlman*, No. 98 Civ. 63 (LAP) (JCF), 2013 WL 4778173, at *4 (S.D.N.Y. Sept. 6, 2013) ("Vacating a final judgment pursuant to Rule 60(b)(6) requires 'extraordinary circumstances.'" (quoting *Gonzalez v. Crosby*, 545 U.S. 524, 535 (2005))); *Dagen v. CFC Grp. Holdings Ltd.*, No. 00 Civ. 5682 (CBM), 2004 WL 830057, at *3 (S.D.N.Y. Apr. 13, 2004) (observing that because courts should not lightly reopen final judgments, Rule 60(b) motions are extraordinary relief that can be granted only upon a showing of exceptional circumstances).

d.   *Remittitur*

Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial. *Abel v. Town Sports Int'l, LLC*, No. 09 Civ.

10388 (DF), 2012 WL 6720919, at *14 (S.D.N.Y. Dec. 18, 2012) (quoting *Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984)).  Under federal law, a court should reduce a jury award only if it is so high as to shock the judicial conscience and constitute a denial of justice.  *Id.* (quoting *Ismail v. Cohen*, 899 F.2d 183, 187 (2d Cir. 1990)).  However, "[u]nder New York law, which is pertinent to the extent that [Plaintiff] was found entitled to recover under the [NYSHRL], an award is deemed excessive 'if it deviates materially from what would be reasonable compensation.'"  *Lore*, 670 F.3d at 177 (quoting N.Y. C.P.L.R. § 5501(c)); *see also Okraynets v. Metro. Transp. Auth.*, 555 F. Supp. 2d 420, 439 (S.D.N.Y. 2008) ("[T]he standard under § 5501(c) is not whether an award deviates *at all* from past awards—it is whether an award deviates *materially* from *reasonable compensation*.").[16]  To determine whether a jury award is excessive within the meaning of Section 5501(c), New York courts compare it with awards in similar cases.  *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 204 (2d Cir. 2014) (internal citations omitted).

## IV.   Discussion

### a.   *Motion for a New Trial*

As noted, there was no dispute that Mrs. Vangas was disabled as defined by the Law, and that her employers had notice of the disability.  Accordingly, the only two elements of her NYSHRL claim for the jury to decide were whether with reasonable accommodation, Mrs. Vangas could have performed the essential functions of her job, and whether Defendants refused to make reasonable accommodations for her needs.  Defendants challenge the jury verdict on

---

[16] "This 'deviates materially' standard for reviewing jury awards is less deferential to a jury verdict than the federal 'shock the conscience' standard because it does not permit a reviewing court to sustain a damage award that is out of line with other awards for similar injuries, even if the amount the jury awarded was not shocking to a court's conscience.'"  *Abel*, 2012 WL 6720919, at *14 (quoting *Fowler v. N.Y. Transit Auth.*, No. 96 Civ. 6796 (JGK), 2001 WL 83228, at *10 (S.D.N.Y. Jan. 31, 2001)).

several grounds.

1.   *August 2010 Request for Indefinite Leave*

Defendants first argue that Plaintiff's request at the end of August 2010 for indefinite

leave should not have been submitted to the jury.  As the New York Court of Appeals made clear

in *Romanello v. Intesa Sanpaolo, S.p.A.*, 976 N.Y.S.2d 426, 428 (2013), indefinite leave is not

considered a reasonable accommodation under the NYSHRL.  Accordingly, the Court ruled on

summary judgment that Plaintiff could not succeed on the NYSHRL claim as a matter of law in

connection with her request for indefinite leave.  According to Defendants, this ruling should

have resulted in a directed verdict on the request for additional leave at the end of August 2010,

and the jury should not have been permitted to consider whether Defendants could have

accommodated her request for leave at that time.  Defs. Mem. L. 11.  There was no error on this

basis.

The Court instructed the jury that it "may not consider any request by Mrs. Vangas for

indefinite leave under the [NYSHRL] claim."  Tr. 733:20-22.  This was an instruction

Defendants explicitly agreed to at trial.  Before the final charge conference held on June 26,

2014, the draft instruction read as follows:  "You may not consider Mrs. Vangas' request for

indefinite leave under the [NYSHRL]."  Defendants' counsel objected to this instruction on the

ground that it would not sufficiently explain to the jury that Mrs. Vangas' request for leave on

August 30, 2010 was for indefinite leave, and that such request could not be considered under the

NYSHRL.  *Id.* 711:9-11.  The Court, after hearing arguments from both sides, expanded the

scope of the instruction to address *any* request for indefinite leave made by Mrs. Vangas:  "[Y]ou

may not consider any request for an indefinite leave by Mrs. Vangas under the [NYSHRL]."  *Id.*

716:2-4.[17]  Accordingly, there is no basis for the argument that the jury would have found

Defendants liable on the basis of an indefinite request for leave.

>2.  *Mrs. Vangas' Request to Work from Home*

Defendants contend that Mrs. Vangas' purported request to work from home should not

have been submitted to the jury because she would not have been able to perform the essential

functions of her job from home or anywhere else at the time because of her physical condition.

Defs. Mem. L. 15-16.  Moreover, according to Defendants, MMC not only prohibited non-

supervisory employees such as Mrs. Vangas from working from home, but also did not have the

technology in place to allow anyone in Mrs. Vangas' position to perform such duties from home.

*Id.* at 16.

It is well-established "that a jury is entitled to believe part and disbelieve part of the

testimony of any given witness, and its assessments of witness credibility and its choices

between competing factual inferences are not to be second-guessed."  *Lore*, 670 F.3d at 149-50

(internal citations omitted).  As the Court instructed, the jury is "not required to accept testimony

even though the testimony is not contradicted and the witness' testimony is not challenged.  [The

jury] may decide, because of the witness's bearing or demeanor, or because of the inherent

improbability of the testimony, or for other reasons sufficient to [them]selves that the testimony

is not worthy of belief."  Tr. 750:25-751-5.  Because the jury was entitled to believe Mrs.

Vangas' testimony, the jury was free to find, as it may have, that Mrs. Vangas could have

worked from home.

Mrs. Vangas' job as utilization management analyst consisted primarily of outreach to

---

[17] Defendants' counsel did not object to this instruction; instead, counsel stated:  "That is fine with me, your Honor."
Tr. 716:5.

MMC patients by telephone.  As part of her duties, Mrs. Vangas used CCMS, a system which could—according to testimony presented at trial—be accessed remotely.  It is also undisputed that several MMC employees, albeit supervisors, were allowed to work from home at times during their employment.  Moreover, because there was evidence that Ms. Quinn—Plaintiff's direct supervisor—did not "have a problem" with Mrs. Vangas' working from home, a jury could reasonably infer that it was possible to permit Mrs. Vangas to do so.  Furthermore, the undisputed fact that certain non-supervisory employees were allowed to work from home following Mrs. Vangas' termination lends support for the conclusion that Plaintiff could have done the same during her employment.[18]  Accordingly, the jury was entitled to credit such testimony and find that MMC could have reasonably accommodated Mrs. Vangas' condition by allowing her to work from home.[19]

---

[18] Defendants argue that Mrs. Vangas' alleged request to work from home fails because, *inter alia*, the testimony about her medical condition in August 2010 established that she would not have been able to perform the essential functions of her job from home or anywhere else at the time.  Defs. Mem. L. 15.  However, the jury was entitled to credit Mrs. Vangas' testimony that she could accomplish her tasks from home.

[19] Defendants contend that MMC continued to accommodate Plaintiff's disability during the period August 5-30, 2014 by providing her with a continuing paid leave of absence, and that the jury therefore should not have been allowed to consider Mrs. Vangas' purported request to work from home during that period.  Defs. Mem. L. 15.  According to regulations promulgated pursuant to the NYSHRL, a "[r]easonable accommodation must be considered" when an employer knows of the employee's disability and the employee requests an accommodation.  9 NYCRR § 466.1(e)(2).  Indeed, "[u]nder the State HRL, an 'employer has a duty to move forward to consider accommodation once the need for accommodation is known or requested.'"  *Romanello*, 976 N.Y.S.2d at 430 (quoting 9 NYCRR § 466.1(j)(4)).  Because no MMC employee testified that Mrs. Vangas made a request to work from home, there was no evidence that Defendants "move[d] forward" with such request.  And while the continuing leave was *an* accommodation, it is not necessarily the case that it was a reasonable accommodation.  *Cf. Fuller v. Interview, Inc.*, No. 07 Civ. 5728 (RJS), 2014 WL 2601376, at *7 (S.D.N.Y. May 14, 2014) (stating that because paid leave may be accompanied by a negative effect on an employee's job responsibilities or promotion prospects, the court could not conclude as a matter of law that such accommodation was reasonable where plaintiff requested to work from home); *see also Noll v. Int'l Bus. Machs. Corp.*, No. 12 Civ. 6239 (HB), 2013 WL 5339159, at *3 (S.D.N.Y. Sept. 24, 2013) (stating that the question of whether a proposed accommodation is reasonable is fact-specific and must be evaluated on a case-by-case basis).

3. *Purported Errors in the Jury Instructions*

Defendants also assert that a new trial should be granted because the jury's verdict was the result of erroneous jury instructions.  Jury instructions are intended to give the jury a clear and concise statement of the law applicable to the facts of the case.  *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*, 727 F. Supp. 2d 256, 276 (S.D.N.Y. 2010) (quoting *Girden v. Sandals Int'l*, 262 F.3d 195, 203 (2d Cir. 2001)).  An erroneous jury instruction requires a new trial unless the error is harmless.  *Id.* (internal citation omitted).  "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law."  *Cameron v. City of New York*, 598 F.3d 50, 68 (2d Cir. 2010) (internal quotation marks and citation omitted).  An error is harmless only if the court is convinced that the error did not influence the jury's verdict.  *Aristocrat Leisure*, 727 F. Supp. 2d at 276 (quoting *Patalano v. Am. President Lines*, 250 F. App'x 425, 427 (2d Cir. 2007)).  Because a trial court has considerable discretion in the formulation and style of jury instructions, a new trial is only warranted if, taken as a whole, the jury instructions gave a misleading impression or inadequate understanding of the law.  *Id.* (quoting *Patalano*, 250 F. App'x at 427-28); *see also Smith v. Tobon*, No. 04 Civ. 3286 (TPG), 2012 WL 3705011, at *7 (S.D.N.Y. Aug. 28, 2012), *aff'd*, 529 F. App'x 36 (2d Cir. 2013) (noting that a jury instruction will be deemed adequate if the charge, taken as a whole, is correct and sufficiently covers the case so that a jury can intelligently determine the questions presented to it).  Here, the jury instructions provided the jury with the correct legal standard and adequately informed them on the law.

i. *Indefinite Leave*

First, Defendants argue that the Court's indefinite leave instruction was erroneous because it failed to instruct the jury that Mrs. Vangas' statement that she was unable to return to

work on August 30, 2010 was not a request for reasonable accommodation.  Defs. Mem. L. 17.[20]

However, that instruction was an accurate statement of law and broader than the instruction

originally proposed by the Court—*in Defendants' favor*.  The purpose of the instruction given at

trial was precisely to preclude the jury's consideration of *any* such request, and, as discussed

above, that instruction was explicitly agreed to by Defendants at trial.[21]  Moreover, the Court

was not required by the law or facts of the case to instruct the jury specifically that Plaintiff's

statement that she was unable to work was a request for indefinite leave.[22]  Regardless, the

instruction here was tailored to limit the jury's consideration to accommodations other than

indefinite leave, and therefore even if the instruction was erroneous—and it was not—

Defendants have not demonstrated prejudice.

### ii.    *Requests Made by Mrs. Vangas*

Second, Defendants argue that the Court erred by failing to instruct the jury to only

---

[20] According to Defendants, the jury should have been instructed "unequivocally" that liability could not be imposed based on Defendants' alleged failure to provide or consider additional leave after August 30, 2010, and that they were not obligated to hold Plaintiff's position open or provide her any accommodation after that date.  Defs. Mem. L. 17.

[21] Defendants' claim that they timely raised objections relating to this instruction conceals the fact that they did not, in fact, object to the instruction that was ultimately read to the jury.  *See* Defs. Mem. L. 18.  While Defendants' counsel initially objected to a similar instruction that the jury could not consider Mrs. Vangas' request for indefinite leave under the NYSHRL, counsel stated that he was "fine with" the finalized instruction.  Tr. 716:5.  Indeed, it was *Plaintiff*—not Defendants—who objected to this language.  *Id.* 716:6-9.  And curiously, Defendants cite, *inter alia*, pages 711-713 of the transcript as the basis for their purported objection; however, the discussion regarding the instruction continued for three more pages of the transcript, at which point Defendants agreed to the revised instruction.  *See* Defs. Mem. L. 18.

[22] Even if such an instruction would have been legally correct, the omission of legally correct language from a jury charge by no means compels the conclusion that a charge is erroneous.  *Cf. Lore*, 670 F.3d at 156 ("'An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law.'" (quoting *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977))); *Owen v. Thermatool Corp.*, 155 F.3d 137, 139 (2d Cir. 1998) ("We will not upset a judgment because of an error in jury instructions if the charge actually given was correct and sufficiently covered the essential issues." (internal quotation marks and citations omitted)); *Santos v. Fedcap Rehab. Servs., Inc.*, No. 00 Civ. 1436 (GEL), 2003 WL 179776, at *4 (S.D.N.Y. Jan. 24, 2003) ("Whether or not requested, omission of a particular charge is error only if the charge relates to an 'essential' issue raised at trial.").

consider requests for accommodation that were actually made by Mrs. Vangas.  Defs. Mem. L.

18.  According to Defendants, the only request that could have been submitted to the jury was

Mrs. Vangas' purported request to work from home, and the jury should have been instructed to

consider only that request, and not any speculative accommodation such as leave after August

30, 2010.  *Id.*[23]  The NYSHRL defines a "reasonable accommodation" as an accommodating

action that does not unreasonably burden the employer from "which [the] action is requested."

N.Y. Exec. Law § 292 [21-e].  While the Court did not include such language in the charge, the

jury was instructed that "[a]n interactive process may involve [a] meeting with the employee

who requests an accommodation, . . . asking the employee what he or she specifically wants,

showing some sign of having considered the employee's request."  Tr. 736:1-5.  Accordingly, the

jury charge did address the interactive process as framed in terms of Plaintiff's request.

Moreover, there were only two reasonable accommodations that were discussed, the request to

work from home—which Mrs. Vangas testified she specifically requested—and the purported

request for indefinite leave.  The jury was specifically told that it could not consider any requests

for indefinite leave.  *See id.* 733:20-22 ("You may not consider any request by Mrs. Vangas for

indefinite leave under the [NYSHRL] claim.").  Thus, to the extent it can be said that the charge

omitted the instruction that a "reasonable accommodation" must be one the employee requests,

this is not a basis for reversal here:  the jury was permitted to credit Mrs. Vangas' testimony that

she requested to work from home.

In *Jacobsen v. N.Y.C. Health & Hosps. Corp.*, 22 N.Y.3d 824, 835 (2014), the New York

Court of Appeals instructed that "the employer's response to the employee's request and any

---

[23] Defendants timely raised an objection on this basis at trial.  *See* Tr. 725:18-21 ("We think, . . . that it is necessary
and essential to instruct the jury that to find defendants liable, you must find Ms. Vangas made a request for
reasonable accommodation.").

ensuing dialogue about the impact of the proposed accommodation on the employer's business

inform the determination of whether a reasonable accommodation exists."  Here, the jury heard

evidence that Mrs. Vangas specifically requested to work from home, and that this request was

either summarily rejected or simply ignored.  As the court observed in *Jacobsen*, the NYSHRL

"prizes reasonableness, and nothing can be more reasonable than an open-minded discussion

resulting in a viable compromise."  *Id.* at 837.  In the case of the request to work from home,

there was no such discussion and, therefore, no such compromise.  Moreover, as discussed

above, the jury heard evidence that would have allowed them to conclude that the proposed

accommodation was possible, and therefore presumably reasonable and would not have caused

undue hardship on MMC, but that it was unwilling to extend that option to employees below a

certain level.  Therefore, Mrs. Vangas met her burden at trial of "proving the existence of a

reasonable accommodation that would have enabled [her] to perform the essential functions

of . . . her position."  *Id.* at 838 (quoting N.Y. Exec. Law § 292 [21]).  Accordingly, because the

charge adequately covered the sum and substance of the applicable law, and there is no reason to

conclude that the instruction prejudiced Defendants, there is no basis for reversal.

        *iii.*    *Interactive Process*

        Third, Defendants contend that it was error to instruct the jury to consider the interactive

process when determining whether Mrs. Vangas had met her burden of proving that she had

requested and was denied reasonable accommodation.  Defs. Mem. L. 19.  The Court instructed

that under the NYSHRL, "the employer's decision to engage in or forgo an interactive process,

or put another way, a dialogue with the employee, is one factor to be considered in determining

whether a reasonable accommodation was available for the employee's disability at the time the

employee sought accommodation."  Tr. 735:15-19.  This instruction was taken directly from

*Jacobsen*.  *See Jacobsen*, 22 N.Y.3d at 838.  Defendants therefore do not challenge the wording

of the instruction, but instead argue that the sole issue for a jury to determine at trial is whether

the plaintiff sustained her burden of proving that she had requested and was denied a reasonable

accommodation.  Defs. Mem. L. 20.

  The Court of Appeals held in *Jacobsen* that the absence of a good faith interactive

process cannot alone compel a grant of summary judgment to the employee or a verdict in her

favor.  Defendants argue that based on this decision, the interactive process should not be

considered after the summary judgment stage.[24]  This position has no basis in the law.  In *Jones*

---

[24] Defendants claim to have raised a timely objection to this instruction on this ground in two ways.  First, Defendants contend that they preserved a claim of error by making their position clear to the Court before trial. Defs. Reply Mem. L. 8 n.9.  Specifically, although they did not they did initially submit a proposed instruction on the interactive process, Defendants argued in their objections to Plaintiff's proposed instruction that the interactive process was irrelevant in light of *Jacobsen* and that such an instruction would confuse the jury because it would not "provide [it] with any guidance on resolving the factual issues in this case."  Doc. 98.  However, Defendants also stated in their written objections that "[t]he law is clear that BOTH employers and employees must engage in the interactive process," and proposed their own instruction on the interactive process in the event that the Court "decide[d] that failure to engage in the interactive process is in itself a violation of the NYSHRL . . . ."  *Id.*  Second, Defendants proposed an alternative instruction at trial that asserted that both Mrs. Vangas and Defendants had a responsibility to make good-faith efforts to engage in an informal interactive process.  Defs. Mem. L. 20; Tr. 490:4-20.

Defendants did not specifically object at trial on the ground that the interactive process is not relevant after the summary judgment stage.  Accordingly, Defendants rely on *Jacques v. DiMarzio, Inc.*, 386 F.3d 192 (2d Cir. 2004), for the argument that they nonetheless preserved the claim of error through their pre-trial written objections to Plaintiff's proposed jury instructions.  In *Jacques*, the Second Circuit observed that although the failure to make a timely objection to a disputed jury instruction ordinarily constitutes a waiver of appellate review of the instruction, it is also well-settled that the purpose of Rule 51 is to give the trial court an opportunity to cure any defects in the instruction, not to multiply redundant motions.  *Id.* at 200.  The court quoted *Girden v. Sandals International*, 262 F.3d 195, 202 (2d Cir. 2001), for the principle that Rule 51 must be read in conjunction with Rule 46, and accordingly a party's failure to object after a charge is given is excused where a party makes its position clear and the trial judge is not persuaded.  *See Jacques*, 386 F.3d at 200-201.  In *Jacques*, the Second Circuit found that the district court was made fully aware of the defendant's argument where it was part of its summary judgment motion and the trial judge discussed and explicitly rejected the position in its written opinion on the motion.  *Id.* at 201 ("Because [the defendant's] position on the validity of this disputed jury instruction was explicitly considered and rejected by the district court in its decision denying summary judgment, we conclude that the issue is not waived on appeal."); *but see Tirreno v. Mott*, 375 F. App'x 140, 141 (2d Cir. 2010) (summary order) (noting that Rule 51 states that a party who objects to the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection, and observing that Second Circuit precedent directs that a party may

*v. East Brooklyn Security Services Corp.*, No. 11 Civ. 6333 (JG), 2014 WL 4724699, at *1 (E.D.N.Y. Sept. 23, 2014), the court denied defendants' motion for judgment notwithstanding the verdict or for a new trial on the basis of an admittedly erroneous instruction that the defendant's failure to engage in the interactive process *was* an independent violation of the NYSHRL.  Significantly, the court noted that "*Jacobsen* nonetheless makes clear that the failure to engage in the interactive process is still evidence to be considered in the plaintiff's case to establish the availability of [a] reasonable accommodation."  *Id.*; *see also Scalera v. Electrograph Sys., Inc.*, 848 F. Supp. 2d 352, 370 (E.D.N.Y. 2012) (denying summary judgment on ADA and NYSHRL reasonable accommodation claims and noting that "the question of whether Defendants engaged in the interactive process is again one left for a jury").  Indeed, despite Defendants' assertion, the interactive process is still a factor for the jury's consideration after *Jacobsen*.[25]

---

not rely on its submission of proposed jury instructions not adopted by the district court to preserve an objection for appeal).

Additionally, it is worth noting that before trial, Defendants objected to Plaintiff's proposed instruction that the employer is required to engage in the interactive process on the ground that the Court of Appeals in *Jacobsen* "state[d] that 'an employer's decision to engage in or forgo an interactive process is but *one* factor to be considered in deciding whether a reasonable accommodation was available . . . .'"  Doc. 98 (quoting *Jacobsen*, 22 N.Y.3d at 838).

[25] Defendants claim that even if the interactive process was relevant to trial, "the record confirms that MMC did engage in the interactive process."  Defs. Mem. L. 21 n.13.  As support for this position, Defendants cite passages of the transcript regarding the extension of Mrs. Vangas' leave period, including the discussion of the July 22, 2010 letter, and Ms. Burns' post-termination conversation with Mrs. Vangas, which took place on August 31, 2010.  *Id.* Because no MMC employee testified that Mrs. Vangas made a request to work from home, however, Defendants do not—and cannot—contend that they engaged in an interactive process in connection with this allegedly proposed accommodation.

In *Jacobsen*, the Court of Appeals observed that the NYSHRL indicates that an employee's suggestion of a specific accommodation "must prompt the employer to consider whether the burden thus imposed upon the employer's business would be reasonable."  *Jacobsen*, 22 N.Y.3d at 835.  Indeed, "[i]n this way, the employer's response to the employee's request and any ensuing dialogue about the impact of the proposed accommodation on the employer's

*iv.    Employer's Failure to Hold a Constructive Dialogue*

Finally, Defendants challenge the Court's instruction that "[t]he employer's failure to [hold a] constructive dialogue about the possibility of a reasonable accommodation may indicate that the employer has discriminated because of an individual's disability within the meaning of the [NYSHRL]."  Defs. Mem. L. 21; *see* Tr. 735:20-24.  As above, this language was taken directly from *Jacobsen*.  *See Jacobsen*, 22 N.Y.3d at 838 n.2.  Defendants argue that the instruction was erroneous because the quoted passage relates to direct discrimination claims under the NYSHRL, rather than reasonable accommodation claims.  According to Defendants, because there was no claim of direct discrimination or issue of causation for the jury to consider, this instruction "fundamentally misled the jury by stating that the absence of a dialogue by defendants could, without more, establish that defendants had discriminated against Mrs. Vangas."  Defs. Mem. L. 22.

Significantly, Defendants did not object to this instruction on the ground specified in the instant motion.[26]  Therefore, Defendants may only now object under the plain error standard.

---

business inform the determination of whether a reasonable accommodation exists."  *Id.*  Despite Defendants' protestations, then, the instruction here was perfectly consistent with both the law and the evidence heard at trial.

Finally, it is worth noting that Defendants themselves proposed an instruction before trial that similarly references the employer's required participation in an interactive process upon an employee's request for accommodation:  "If you find that Montefiore refused to engage in the interactive process in response to Ms. Vangas's request for accommodation, *you must return a verdict against the defendants*."  Doc. 98 (emphasis added).

[26] Defendants claim that they timely objected to the instruction in two ways.  First, they contend that they raised an objection through the submission of proposed jury instructions that omitted the interactive process instruction.  Defs. Mem. L. 20 n.11.  However, "the mere submission of a proposed set of jury instructions that differed from the final charges is not enough to preserve a claim of error; a party must offer specific objections to the proposed charge in order to give a chance for the opposing party to respond and the court to correct any errors."  *Jones*, 2014 WL 4724699, at *1.  Second, Defendants claim that they objected to the interactive process instruction twice during trial.  Defs. Mem. L. 20 n.11.  As Plaintiff notes, however, the cited pages of the record reveal no objection on this ground.  Pl. Opp. Mem. L. 13.  Instead, Defendants proposed, *inter alia*, an alternative instruction that only slightly altered the sentence regarding the constructive dialogue by changing "the possibility of a reasonable accommodation" to "the possibility of an employee's proposed accommodation."  Tr. 727:2-7.

*See* Fed.R.Civ.P. 51(d)(2) ("A court may consider a plain error in the instructions that has not been preserved . . . if the error affects substantial rights").  The Second Circuit has cautioned that "the plain error exception to Rule 51's objection requirement 'should only be invoked with extreme caution in the civil context.'"  *Rasanen v. Doe*, 723 F.3d 325, 333 (2d Cir. 2013) (quoting *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 18 (2d Cir. 1996)).  To constitute plain error, a court's action must contravene an established rule of law and go to the very essence of the case.  *Id.* (internal quotation marks and citations omitted).  The 'constructive dialogue' instruction here clearly does not satisfy this standard.

As the Court of Appeals noted in *Jacobsen*, the Second Circuit and most other federal courts have held the interactive process to be a means of determining the availability of a reasonable accommodation rather than an overall sign of the discriminatory basis of an adverse employment action.  22 N.Y.3d at 838 n.2.  The court in *Jacobsen* also stated the view—which this Court included in the jury charge here—that "the employer's failure to hold a constructive dialogue about the possibility of a reasonable accommodation may indicate that the employer has discriminated 'because of' an individual's disability within the meaning of the State HRL . . . ." *Id.*  The Court of Appeals then noted that under the NYSHRL, the lack of an interactive process is relevant primarily to the issue of whether a reasonable accommodation was available for the employee's disability and does not substantially impact the court's or the factfinder's determination of causation.  *Id.*  Accordingly, the instruction was not erroneous, much less plainly erroneous.[27]

---

[27] Moreover, even if the Court found that Defendants had objected on this ground—and they did not—there is no basis to conclude that the instruction, which stated only that the failure to hold a constructive dialogue *may* indicate discrimination, had any bearing on the verdict here.

4.   *Amendment of the Jury Instructions After Summations*

Defendants argue that they were prejudiced by the fact that the Court changed the

indefinite leave instruction after counsel's summations.  Specifically, Defendants contend that

the Court's decision to "replace[] the more definite" instruction regarding indefinite leave "with

the vague and inconclusive instruction that was included in the final charge" denied them the

opportunity to conform their closing argument to the jury charge.  Defs. Mem. L. 24 n. 18.

However, this argument once again ignores the fact that their counsel stated that he was "fine

with" the instruction read to the jury, that the finalized instruction was more favorable to

Defendants than the instruction it replaced, and that *it was Defendants who requested the change*

*in the instruction after summations*.  *See* Tr. 715:9-12, 714:17-19 (stating that the indefinite leave

instruction, if not changed, would "[be] as if that summary judgment motion and decision . . . did

not happen because there is no vetting, we are not narrowing the scope of the issues for the jury,"

and proposing the alternative instruction:  "[Y]ou may not consider Ms. Vangas' leave [if] she

ha[d] not provided a return date").

Under Rule 51(b)(1), a trial court is required to inform the parties of its proposed

instructions before instructing the jury and before final jury arguments.  Fed.R.Civ.P. 51.  Here,

the parties were well-acquainted with the jury instructions before the Court made the requested

change to the indefinite leave instruction:  the parties submitted proposed injury instructions one

month before trial; received the Court's draft jury instructions after the first day of trial; and

discussed the instructions with the Court on the record, and outside the presence of the jury,

throughout the trial.  Moreover, because Defendants did not object to the Court's amending of

the instruction, their challenge to the verdict on this ground is reviewed for plain error.  *See*

*Snyder v. N.Y. State Educ. Dep't*, 486 F. App'x 176, 180 (2d Cir. 2012), *cert. denied*, 133 S. Ct.

653 (2012) ("[T]his Court has held that a party must demonstrate that the district court's actions constituted plain error if he fails properly to object to a district court's Rule 51(b)(1) violation." (citing *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 152 (2d Cir. 2010), *cert. denied*, 131 S. Ct. 1602 (2011)).  Defendants rely on *Gordon v. New York City Board of Education*, 232 F.3d 111, 118 (2d Cir. 2000), in support of their argument.  In that case, the Second Circuit stated that a district court's failure to notify the parties of an intended jury charge prior to summation is reversible error where counsel is hindered in his or her ability to present summations that fully deal with the issues to be placed before the jury.  *Id.*  That was not the case here.  According to Defendants, their counsel was hindered because he could not "explain[] to the jury that they could not consider the only conceivable request for leave that was in the record:  Mrs. Vangas's request for indefinite leave in August 2010."  Defs. Mem. L. 24 n.18.  However, that is *precisely* what counsel argued during his summation:  "After the running of the family leave, there was never, ever, ever any subsequent request by Ms. Vangas for additional leave.  There was never, ever any request by Ms. Vangas, and there is nothing in the record to suggest that there is, for anything other than an accommodation to work from home."  Tr. 650:4-9; *see also id.* at 650:12-14 ("If she had requested leave, if there [were] specifics she could [offer] us, don't you think she would have?").  Accordingly, Defendants have not shown that the changing of the indefinite leave instruction after summations affected their substantial rights.  *Cf. Snyder*, 486 F. App'x at 180 (stating that the district court did not err in rejecting plaintiffs' argument that they were not afforded adequate time to review the final jury instructions because plaintiffs failed to raise any relevant objections before or after the charges were read, belatedly submitted their own proposed jury instructions, and were on timely notice of similar jury instructions filed by the defendant); *see also Henry*, 616 F.3d at 152 ("Under the circumstances, we need not take up the complex

issue of the specificity with which a district court must describe its proposed jury instructions in order to comply with Rule 51, because [plaintiff's] counsel did not properly object to the district judge's failure to provide a copy of the instructions.").

     5.   *Plaintiff's Counsel's Summation*

Defendants also argue that statements made during Plaintiff's counsel's summation warrant a new trial for two reasons.  First, Plaintiff's counsel argued—in contradiction to *Jacobsen*—that liability could be found based solely on Defendants' failure to engage in the interactive process:  "And why didn't Elizabeth Burns engage in an interactive process? . . . 'Cause if [Mrs. Vangas is] terminated on the 30th, there's no interactive process and they've violated the law."  Defs. Mem. L. 24; *see* Tr. 683:18-19.  Second, according to Defendants, Plaintiff's counsel repeatedly invited the jury to speculate about potential accommodations which were never requested, including additional leave.  Defs. Mem. L. 23.  For example, Plaintiff's counsel argued that five months' leave was inappropriate and unreasonable for a cancer patient.  *Id.* at 23-24.

"A court should examine the propriety of a closing argument by reviewing the entire argument within the context of the court's rulings on objections, the jury [charge], and any corrective measures applied by the trial court."  *Parrish v. Sollecito*, 280 F. Supp. 2d 145, 168 (S.D.N.Y. 2003) (internal quotation marks and citations omitted); *see also Malmsteen v. Berdon, LLP*, 595 F. Supp. 2d 299, 309 (S.D.N.Y. 2009) (stating that in assessing the impact of allegedly improper comments by counsel during summation, a court must examine, on a case-by-case basis, the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, the manner in which the parties and the court treated the comments, the strength of the case, and the verdict itself), *aff'd*, 369 F. App'x

248 (2d Cir. 2010).  "It is well established that '[n]ot every improper or poorly supported remark

made in summation irreparably taints the proceedings; only if counsel's conduct created undue

prejudice or passion which played upon the sympathy of the jury, should a new trial be

granted.'"  *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 581 (S.D.N.Y. 2011)

(quoting *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 127 (2d Cir. 2005)); *see also Parrish*,

280 F. Supp. 2d at 168 ("A new trial is only warranted where the attorney's concluding argument

deprived the opposite party of a fair trial." (internal quotation marks and citation omitted)).

"Whether to order a new trial due to remarks made during summation 'is within the broad

discretion of the trial court.'"  *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d at 127

(quoting *id.*).

Counsel's statement regarding the interactive process does not warrant a new trial.  First,

Defendants' counsel did not object to the statement at the time it was made, which "considerably

undermine[s]" Defendants' claim that they were prejudiced by it.  *Malmsteen*, 595 F. Supp. 2d at

310; *see also Guzman v. Jay*, 303 F.R.D. 186, 195 (S.D.N.Y. 2014) (stating that defendant's

arguments that opposing counsel's remarks during summation had more than a *de minimis* effect

on the trial were "seriously undercut, if not waived," by counsel's failures to lodge a

contemporaneous objection and to raise this issue before his reply brief); *Okraynets*, 555 F.

Supp. 2d at 430 (concluding that defendants did not show undue prejudice arising from

summation where their counsel did not object to the comment when made or move after

summation for it to be stricken from the record); *Claudio v. Mattituck-Cutchogue Union Free*

*Sch. Dist.*, 955 F. Supp. 2d 118, 158 (E.D.N.Y. 2013) (noting that defendant's argument that it

was prejudiced by plaintiff's summation was undermined by its failure to object to the remarks at

trial).  Second, it is not at all clear that the comment—which suggested that the lack of a good

faith interactive process could automatically compel a verdict in the employee's favor—was

prejudicial. The complained-of comment was made only once, and despite Defendants'

complaint that Plaintiff's counsel "devote[d] no less than six pages of her summation of her

summation to attacking defendants for their alleged failure to engage in the interactive process,"

Defs. Mem. L. 24, the Court has already determined that the interactive process was a factor for

the jury's consideration on the NYSHRL claim. Accordingly, although counsel's statement

misstated the standard for liability, it was entirely proper for counsel to comment on Defendants'

efforts, or lack thereof, in engaging in a "constructive dialogue" with her client. Moreover, the

Second Circuit has noted that where the jury's verdict finds substantial support in the evidence,

counsel's improper statements will frequently be *de minimis* in the context of the entire trial.

*Guzman*, 303 F.R.D. at 196 (quoting *Marcic*, 397 F.3d at 124). As discussed above, there was

substantial evidence supporting the verdict here, and the fact that counsel's isolated statement—

to which Defendants did not contemporaneously object—was made in the context of a

summation spanning thirty-eight pages of the transcript at the end of a week-long trial suggests

that it had a *de minimis* effect here. *Cf. Marcic*, 397 F.3d at 126-28 (stating that to the extent that

counsel's "rather inflammatory" and "hardly commendable" comments were improper, they

were not objected to, and "occurred in the context of a summation spanning thirty-seven pages of

trial transcript, at the end of a week-long trial in which voluminous evidence was introduced that

sufficed to support the jury's verdict."). Furthermore, the corresponding jury instruction was

legally correct, and stated only that the interactive process was a factor for the jury's

consideration. It is therefore presumed that the jury followed the Court's instructions rather than

counsel's statement. *Cf. Fodelmesi v. Schepperly*, 133 F.3d 907, *1 (2d Cir. 1998) (noting the

normal assumption that the jury will follow the court's instructions and finding that any

misstatements by counsel as to the legal standard were cured by the proper recitation of the
standard in the jury instructions).

Finally, the Court instructed the jury that "[a]rguments made by the attorneys are not
evidence," and that counsel's statements during summation are only intended to help the jury
understand the evidence to reach a verdict.  Tr. 746:18-19; *cf. Air China, Ltd. v. Kopf*, 473 F.
App'x 45, 51 (2d Cir. 2012) (summary order) (denying motion for new trial based on plaintiff's
counsel's statements during summation that defendant was "a disgrace," a "schmuck," a "scam
artist," and "con man" who had a "fundamental dishonesty" where the comments were isolated,
the jury was instructed that counsel's statements do not constitute evidence, and defendant's
counsel did not contemporaneously object to the remarks); *Pierrelouis ex rel. Pierrelouis v.
Bekritsky*, No. 08 Civ. 123 (KTD), 2012 WL 6700217, at *7 (S.D.N.Y. Dec. 21, 2012) (denying
motion for new trial based on statements during closing arguments because of the presumption
that a jury follows the instructions of the court); *Saladino v. Stewart & Stevenson Servs., Inc.*,
No. 01 Civ. 7644 (SLT), 2011 WL 284476, at *11 (E.D.N.Y. Jan. 26, 2011), *aff'd*, 500 F. App'x
69 (2d Cir. 2012) (denying motion for new trial on basis of improper summation comments
where court issued limiting instruction that statements by lawyers are not evidence).

For similar reasons, Plaintiff's counsel's statement regarding the appropriateness of five
months' leave does not warrant a new trial.  As above, Defendants did not make a
contemporaneous objection to this remark.  Moreover, it was appropriate for counsel to comment
on the reasonableness of any accommodation actually provided to Mrs. Vangas.  And even if
counsel's comment that "when you need six months, five months is not enough" suggested that
liability could be found on the basis of a request for indefinite leave, Tr. 688:9-10, there is no
reason to conclude that the jury found Defendants liable on such basis because of the indefinite

leave instruction. Defendants' motion for a new trial on the basis of the jury instructions and Plaintiff's counsel's summation is therefore DENIED.[28]

b. *Remittitur*

1. *Back Pay*

The rule in this Circuit is that a back pay award runs from the date of the discriminatory action to the date of the judgment. *E.E.O.C. v. Joint Apprenticeship Comm.*, 186 F.3d 110, 124 (2d Cir. 1998). The purpose of back pay is to completely redress the economic injury the plaintiff has suffered as a result of discrimination. *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 145 (2d Cir. 1993), *cert. denied*, 510 U.S. 1164 (1994) (internal quotation marks and citations omitted). Accordingly, an award of back pay typically consists of lost salary, including anticipated raises, as well as step increases, cost of living expenses, and other increases necessary to make the plaintiff whole. *DeCurtis v. Upward Bound Int'l, Inc.*, No. 09 Civ. 5378 (RJS), 2011 WL 4549412, at *3 (S.D.N.Y. Sept. 27, 2011) (internal citation omitted); *Epter v. N.Y.C. Transit Auth.*, 216 F. Supp. 2d 131, 135 (E.D.N.Y. 2002) (internal citation omitted).

Defendants argue that the jury's award of $155,000 unreasonably exceeds the difference between Mrs. Vangas' expected earnings had she remained an MMC employee and her actual earnings over the 46-month period between her termination and the trial of this matter. Defs.

---

[28] Given the Court's conclusion with regard to Defendants' motion for a new trial, the Court necessarily finds that Defendants have not met the more restrictive standard for judgment as a matter of law. Moreover, Defendants challenge the verdict as against Ms. Burns and Ms. Quinn under the NYSHRL's aiding and abetting theory of liability on the basis that there was no underlying violation by MMC. Defs. Mem. L. 16; *see, e.g.*, *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 367 (S.D.N.Y. 2012) (stating that to be liable under the aiding and abetting theory, an individual employee need not have supervisory hiring and firing power, but must have "actually participated" in the conduct giving rise to the claim). However, because the Court has upheld the verdict as against MMC, this argument necessarily fails. Additionally, even if Defendants were to challenge Ms. Burns' and Ms. Quinn's "actual participation" in the conduct giving rise to the violation—and it does not appear that Defendants have—the Court would find that there was sufficient evidence of the individual defendants' personal involvement here.

Mem. L. 26-27.  According to Defendants, the jury should have awarded Plaintiff, at most, approximately $109,000 in back pay damages.  *Id.* at 27.[29]  This calculation is consistent with that provided by Plaintiff's counsel during her summation:  $110,000.  *See* Pl. Opp. Mem. L. 17.  However, Plaintiff now attempts to rationalize the difference between her initial request for back pay and the jury award—a difference of $45,000—on the basis of the additional benefits which are typically included in such an award.  According to Plaintiff, because the jury heard evidence that Mrs. Vangas lost benefits as a result of her termination, they reasonably valued such benefits, anticipated raises, step increases, and cost of living adjustments at $45,000.[30]

Plaintiff argues that the $155,000 award does not deviate materially from what would have been reasonable compensation.  As the parties themselves once agreed, however, reasonable compensation here would have been approximately $110,000.  And Plaintiff's counsel's abstract arguments in support of a windfall of 40% in excess of her own estimate cannot save the award here.

Plaintiff relies on *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1191 (2d Cir. 1992), *cert. denied*, 506 U.S. 826 (1992), for the argument that the award here does not materially deviate from reasonable compensation.  Pl. Opp. Mem. L. 18.  In that case, the Second Circuit affirmed a front pay award of $310,000 on an NYSHRL age discrimination claim.  *Tyler*, 958 F.2d at 1190.  The Second Circuit noted that while the award was "slightly higher" than the plaintiff's expert's calculation of $266,106, the award neither shocked the conscience nor

---

[29] According to Defendants, this sum represents the difference between the approximately $189,000 Mrs. Vangas would have earned as an MMC employee—reflecting Plaintiff's annual salary of $49,175.62 paid over the 46-month period—and the approximately $80,000 she actually earned following her termination.  Defs. Mem. L. 26-27.

[30] In opposition to the instant motion, Plaintiff mistakenly calculates the difference between her estimate of back pay damages and the actual award as $56,000.  Pl. Opp. Mem. L. 17.

deviated substantially from what would be reasonable compensation. *Id.* However, the difference between the award and plaintiff's calculations in that case—approximately $44,000— was only 16.5% higher than estimated. Here, the difference is over 40%. While such an award understandably did not deviate materially from reasonable compensation in *Tyler*, the award here does. Accordingly, Defendants' motion for a new trial will be granted unless Plaintiff agrees to a remittitur reducing the award of back pay from $155,000 to $110,000.

       2.  *Front Pay*

The purpose of front pay is to make victims of discrimination whole, not to place the plaintiff in a better position than she would have occupied had she not been terminated. *Thomas v. iStar Fin., Inc.*, 508 F. Supp. 2d 252, 260 (S.D.N.Y. 2007), *aff'd*, 629 F.3d 276 (2d Cir. 2010). Defendants contend that the jury's award of $190,000 in front pay damages—representing over eleven years of front pay—was unduly speculative. Defs. Mem. L. 28. They argue that there are a number of plausible reasons why Mrs. Vangas would have ceased employment at MMC prior to 2025, including a change in management or changed personal circumstances. *Id.* According to Plaintiff, however, she worked at MMC for over 20 years and had every intention of retiring there. Pl. Opp. Mem. L. 18. Additionally, because she does not have a college degree or special skills, Plaintiff claims that the highest-paying job she could find following her termination paid an annual salary of approximately $32,000. *Id.* at 19.

The jury's front pay award does not materially deviate from reasonable compensation. As courts within the Second Circuit have observed, "[i]t is true that 'front pay awards always involve some degree of speculation . . . .'" *Ward v. N.Y.C. Trans. Auth.*, No. 97 Civ. 8550 (HB), 1999 WL 446025, at *9 n.8 (S.D.N.Y. June 28, 1999) (quoting *Tanzini v. Marine Midland Bank, N.A.*, 978 F. Supp. 70, 81 (N.D.N.Y. 1997)). An award of eleven years' duration is neither

unduly speculative nor unreasonable in this instance.  *Cf. Luca v. Cnty. of Nassau*, 344 F. App'x

637, 641 (2d Cir. 2009) (summary order) (affirming award of front pay in the amount of

$604,589 to former probation officer based on plaintiff's testimony that she intended to work

until age 62, another 36 years); *Padilla v. Metro-North Commuter R.R.*, 92 F.3d 117, 126 (2d

Cir. 1996) (affirming denial of motion to set aside front pay award on Age Discrimination in

Employment Act retaliation claim where it represented difference in pay over a period of 20

years, until the plaintiff reached the age of 67), *cert. denied*, 520 U.S. 1274 (1997); *Tanzini*, 978

F. Supp. at 81 (finding that a jury's front pay award of $250,000 on NYSHRL age discrimination

claim—representing a 20-year period—did not materially deviate from reasonable

compensation).[31]  Accordingly, the Court does not find that Defendants are entitled to a

remittitur of the front pay award.

> 3.  *Compensatory Damages*

Finally, Defendants challenge the award of compensatory damages in the amount of

$181,000.  In determining whether this award materially deviates from reasonable compensation,

the Court must consider awards in analogous cases for injuries similar to those sustained by

Plaintiff.

Emotional distress awards within the Second Circuit can generally be grouped into three

categories of claims:  'garden variety,' 'significant,' and 'egregious.'  *MacMillan v. Millenium

Broadway Hotel*, 873 F. Supp. 2d 546, 560 (S.D.N.Y. 2012) (quoting *Olsen v. Cnty. of Nassau*,

615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009)).  First, in 'garden variety' emotional distress claims, the

evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes

---

[31] Moreover, there is no basis to conclude that Defendants' alternative proposal—a reduction of the front pay award to $33,114.98, which would represent an award of two years' duration—would be any less speculative.

his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury. *Id.* (quoting *Olsen*, 615 F. Supp. 2d at 46). Such claims typically lack extraordinary circumstances and are not supported by any medical corroboration. *Id.* (quoting *Olsen*, 615 F. Supp. 2d at 46). Second, the 'significant' emotional distress claims differ from the 'garden variety' claims in that they are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses. *Abel*, 2012 WL 6720919, at *15 (internal citation omitted). Finally, 'egregious' emotional distress claims generally involve either outrageous or shocking discriminatory conduct or a significant impact on the physical health of the plaintiff. *Caravantes v. 53rd St. Partners, LLC*, No. 09 Civ. 7821 (RPP), 2012 WL 3631276, at *22 (S.D.N.Y. Aug. 23, 2012) (quoting *Olsen*, 615 F. Supp. 2d at 47). In 'significant' or 'egregious' cases, where there is typically evidence of debilitating and permanent alterations in lifestyle, larger damage awards may be warranted. *Id.* (quoting *Olsen*, 615 F. Supp. 2d at 47).

This case clearly falls into the garden variety category.[32] Mrs. Vangas offered relatively little evidence of emotional distress at trial. She testified that she was happy as an MMC

---

[32] Plaintiff does not explicitly challenge Defendants' characterization of her emotional distress as 'garden variety.' However, the authority on which she relies suggests that Plaintiff believes her emotional distress to have been significant or egregious. *See, e.g.*, *Brady v. Wal-Mart Stores, Inc.*, 455 F. Supp. 2d 157, 198 (E.D.N.Y. 2006) (reducing compensatory damages award from $2.5 million to $600,000 where jury may have found that plaintiff, who was born with cerebral palsy, experienced serious emotional trauma as a result of his being subjected to a hostile work environment), *aff'd*, 531 F.3d 127 (2d Cir. 2008); *Cavagnuolo v. Baker & McKenzie*, No. 1B-E-D-86-115824, 1993 WL 766865, at *9 (N.Y. Div. of Human Rights Dec. 17, 1993) (awarding $500,000 to former law firm associate terminated on basis of AIDS diagnosis where firm's treatment was "devastatingly cruel" and plaintiff's "psyche was punctured, his self-reliance was smashed, and his well-being was erased" as a result); *Simmons v. N.Y.C. Transit Auth.*, No. 02 Civ. 1575 (CPS), 2008 WL 2788755, at *9 (E.D.N.Y. July 17, 2008) (denying remittitur of compensatory damages award in the amount of $150,000 where jury heard testimony from plaintiff's psychologist), *aff'd*, 340 F. App'x 24 (2d Cir. 2009). These cases are plainly inapposite.

employee, but that her termination made her feel worthless; she had trouble finding a job, became emotional, and gained a significant amount of weight.  Mr. Vangas presented similar testimony.  He stated that Plaintiff was "happy-go-lucky" before her cancer diagnosis, and became upset, confused, and hurt upon her termination.  Mrs. Vangas and her husband did not support their testimony with any medical corroboration.  Indeed, Plaintiff did not seek psychological treatment in the wake of her termination.

In *Abel*, the court reduced an emotional distress award of $300,000 to $100,000 where the plaintiff offered evidence of 'garden variety' distress in connection with his hostile work environment claim.  2012 WL 6720919, at *16, *18.  Reminiscent of the testimony presented here, the plaintiff in *Abel* offered evidence that he was hurt by his employer's conduct, became stressed and "not himself," and gained weight as a result.  *Id.* at *16.  The court noted that the plaintiff provided vague and general evidence, and failed to offer much detail regarding the duration, severity, or consequences of his condition.  *Id.* (internal citation omitted).  Likewise, in *Campbell v. Cellco Partnership*, No. 10 Civ. 9168 (SAS), 2012 WL 3240223, at *4 (S.D.N.Y. Aug. 6, 2012), the court reduced an emotional distress award from $200,000 to $125,000 on a NYCHRL retaliation claim where the plaintiff testified that he felt financially strained, had difficulty sleeping, was unnerved, and suffered a loss of dignity based on his employer's conduct.  And in *MacMillan*, the court reduced the compensatory damages award on a hostile work environment claim from $125,000 to $30,000 where the plaintiff and his daughter testified in conclusory terms that he "wasn't as happy anymore" and "wasn't [the] same self" during the course of his employment.  873 F. Supp. 2d at 561, 563.  These 'garden variety' cases all support

the reduction of the award in this case.[33]  *See also Johnson v. Strive E. Harlem Emp't Grp.*, 990 F. Supp. 2d 435, 456-57 (S.D.N.Y. 2014) (finding that plaintiff proved at most $80,000 in emotional distress based on her testimony regarding her emotional reaction to her supervisor's use of a racial epithet and her treatment by two therapists); *Belizaire v. RAV Investigative & Sec. Servs. Ltd.*, --- F. Supp. 3d ----, No. 12 Civ. 8268 (JPO) (DF), 2014 WL 6611560, at *24, *25 (S.D.N.Y. Nov. 21, 2014) (adopting recommendation of an emotional distress award in the amount of $30,000 where plaintiff testified that "psychologically [he] didn't feel okay" after his termination, was prescribed stress medication as a result, and lost self-esteem and felt some distress upon trying to find a new job).[34]

Accordingly, in light of the cases discussed above, Defendants' motion for a new trial will be granted unless Plaintiff agrees to a remittitur reducing the compensatory damages award from $181,000 to $125,000.

---

[33] These cases are also consistent with the court's observation in *Campbell* that where there is no medical corroboration of the plaintiff's testimony as to emotional distress or evidence of physical effects, the Second Circuit generally upholds emotional distress damages in the amount of $125,000 or less and reduces awards of greater than $125,000.  *Campbell*, 2012 WL 3240223, at *4; *cf. Lore*, 670 F.3d at 177 (observing that the Second Circuit has affirmed awards of $125,000 to plaintiffs for emotional distress resulting from age discrimination where the evidence consisted only of testimony establishing shock, nightmares, sleeplessness, humiliation, and other subjective distress, as well as awards of $175,000 where there was also either "physical sequelae"—*i.e.*, secondary physical results or consequences—or professional treatment).

[34] Moreover, Plaintiff's emotional distress does not approach that found in cases where courts have awarded amounts similar to the amount awarded by the jury here.  *Cf. Caravantes*, 2012 WL 3631276, at *24, *26 (awarding $150,000 in compensatory damages where sexual harassment was found to be 'egregious' based on the extensive nature of the supervisor's discriminatory conduct and the significant impact it had on plaintiff's mental health, which was corroborated by medical testimony and evidence); *see also Moore v. Houlihan's Rest., Inc.*, No. 07 Civ. 3129 (ENV) (RER), 2011 WL 2470023, at *6 (E.D.N.Y. May 10, 2011), *adopted by*, 2011 WL 2462194 (E.D.N.Y. June 17, 2011) (observing that courts have upheld awards of over $100,000 in the case of 'egregious' emotional distress claims).

## V.    Conclusion

For the reasons stated above, Defendants' motion for judgment as a matter of law is DENIED.  Defendants' motion for a new trial is granted unless Plaintiff agrees in writing by April 24, 2015, to a remittitur reducing the back pay award to $110,000 and the compensatory damages award to $125,000.  The Clerk of the Court is directed to terminate the motion.  Doc. 126.


It is SO ORDERED.

Dated:    April 3, 2015
          New York, New York

                                            _____
                                            Edgardo Ramos, U.S.D.J.